STATE OF NEBRASKA, APPELLEE, V. DIANE K. HARTMANN, ALSO KNOWN AS BRANDI HARTMANN, APPELLANT.

476 N.W.2d 209

Filed October 25, 1991.    No. 90-399.

Kirk E. Naylor, Jr., for appellant.

Don Stenberg, Attorney General, and James H. Spears for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

Pursuant to verdict, defendant-appellant, Diane K. Hartmann, also known as Brandi Hartmann, was adjudged guilty of manslaughter, in violation of Neb. Rev. Stat. § 28-305 (Reissue 1989), and sentenced to imprisonment for a period of not less than 5 nor more than 15 years. She assigns as error the district court's (1) limitation of her right to cross-examine one of the plaintiff-appellee State's witnesses and (2) imposition of an allegedly excessive sentence. We affirm.

## II. FACTS

Hartmann, who was 30 years old at the time of the event, is a married woman and the mother of two children, a son, who was then 6, and a daughter, then 3. She first babysat the decedent child, Danny Hartshorn, in June 1987 for approximately 6 weeks. During this time, the child, who was then approximately 8 months old, was allegedly struck by Hartmann's son. The injury resulted in a bruise which covered two-thirds of the

child's back. The child's mother, Linda Hartshorn, spoke with Hartmann regarding the matter, but it was concluded that "kids would be kids" and that the injury was the result of an accident. Hartmann's mother-in-law, who resides about "91 steps" from Hartmann, also saw the bruise on the child.

Because Hartmann was having back problems, the mother had another friend, Jackie Robinson, babysit the child. Robinson was pregnant and thus only able to watch the child until the first week of December 1987. Consequently, Hartmann babysat the child again from early December 1987 until the first part of February 1988. During this period, the child developed water blisters on all 10 fingers, but no cause was ever found. The child was again placed with Robinson, where he remained for 2 months. Problems within her family prevented Robinson from babysitting the child any longer, so he was again placed in Hartmann's care in April 1988.

Sometime during that month, the mother, a registered nurse, noticed that the child was hanging awkwardly by one arm while playing on a swing at home. She, however, found nothing unusual. The next day, the child was taken to Hartmann, where, according to her, he acted funny. When his mother took the child home that evening, she noticed him favoring one arm. This time she found a lump on his shoulder, which led to the discovery that he had a broken clavicle. The injury was treated, but the evidence does not reveal how it occurred.

The child was next injured around June 11, 1988. When his mother went to Hartmann's house to pick him up, the child "had a black eye and his nose was all bruised . . . red and swollen and he had a big lip on the opposite side of the eye that was injured." The child's mother testified that Hartmann reported the child had "hit the — They have a patio there . . . he had fallen off the patio and hit the step" when the child followed Hartmann's son out the back door. According to the mother, the child "looked terrible, but [she] got him home and [she] watched him and he — he acted fine, except for the bruises."

In approximately the last week of June, the child again was injured while at Hartmann's home. Hartmann claimed that on this occasion her son had "gotten [the child] down in the grass

or gotten him down outside, when she took [her daughter] to the bathroom." The child had visible scratches on his face, and after his mother undressed him at home, she discovered "a 50 cent size piece bruise over the right groin — or the right small of his back. Then he had about a three inch area of bruising over the spinal column, like kind of in the middle of the back." These bruises were also seen by the child's father.

The child's mother was told by one friend to look for a new babysitter, while several other people told her that such injuries occasionally occur. The child's mother discussed the matter with her husband, who suggested she stop taking the child to Hartmann, but the mother felt she could not just stop taking him there because the Hartmanns were "our friends, you just can't treat people like that." Hartmann thereafter promised not to leave her son alone with the child.

On July 12 and 13, 1988, the child's mother did not work and remained home with the child. Nothing unusual happened to him on these days. She testified that on the day of the fatal injury, July 14, 1988, the child had not appeared ill and had no visible bruises or marks on his body. She further testified that the child would "whine a little bit" on the way to and when dropped off at Hartmann's home.

At 4:10 p.m. on the last-mentioned day, the child's mother received a telephone call from Hartmann. According to the child's mother, Hartmann "said that [the child] was sick. . . . [H]e woke up from his nap and vomited and that he was breathing funny." The mother asked, "[W]ell, do you think I should come? And [Hartmann] said, [Y]es, I think you should." It took the mother approximately 10 minutes to drive to Hartmann's house. According to the mother, when she arrived, Hartmann's son came running out, "hysterical and crying . . . . And he said, [the child is] sick. . . . [H]e won't talk to me, his eyes are jerking." The child's mother also stated that when she arrived, the child was unconscious, his eyes would not respond, nor would he respond to his mother's voice. She further testified:

I saw my child laying there. Generalized seizures.

. . . .

. . . He was having tremors of all of his — his arms and

his legs. They were like fine tremors, they weren't like major tremors.

. . . .

. . . He was dusky blue. His eyes were jerking toward the right and his head was jerking toward the right. And as I walked in, I thought he was dead.

The child's mother directed Hartmann to call 911 and, over the next few moments, applied cardiopulmonary resuscitation. According to the mother, when she inquired as to her child's condition and behavior that day, Hartmann said she had no idea what happened: "[Hartmann] said he . . . had slept longer than usual," and when she realized he was not waking up at his normal time, she went to check on him and "found him in vomit"; the child had eaten lunch, and Hartmann knew of no injuries that day. However, one of the emergency medical technicians called to the scene reported the mother had told him the child had not had a good day, that he had been listless and tired. The technician assumed that in making that statement, the mother was reporting what Hartmann had told her. The technician also formed the impression that the child had not eaten well at noon, but the mother did not actually say this to him. She reported only that Hartmann had said the child was tired around naptime, that nothing different had happened that day, and that he had not gotten hurt.

Hartmann's son testified that the child seemed no different on the day in question than he had on any other day, that the child sat while the witness had a swimming lesson before lunch, and that the child did not then seem sick or hurt. However, the witness did at one point say that the child had not eaten well at lunch.

Investigator Jack L. Wyant testified that Hartmann told him that on July 14 the child played in the morning and after lunch before taking his nap. He was out of her sight for only short periods of time, and she said nothing about the child being sick or injured, but did report she heard a "hurt-type cry" from the child while she was outside with him and her children putting up a tent. Hartmann later told Wyant that the child had been fussy at lunch, but did eat.

Hartmann also told Wyant that at 2:30 p.m., just prior to

laying the child down for his nap, her children walked over to her mother-in-law's house. However, the mother-in-law testified that the children arrived at 12:30 p.m., a statement corroborated by the testimony of Hartmann's son, and that they left her home at about 4:20 p.m. Thus, there was testimony that for approximately a 3½-hour period, Hartmann was the only one home with the child. The mother-in-law also testified that Hartmann's son returned to her house within 5 minutes of his departure to tell her that the child was ill.

The two emergency medical technicians called to the scene testified that when they arrived, the child was unconscious. He was rushed to the Seward hospital and later taken to Lincoln General Hospital. All attempts to stabilize the child's condition were futile.

The physician who treated the child in Seward testified that he was in "grave distress." The physician treating the child at the Lincoln hospital testified that the child's condition suggested "significant brain injury." An angiogram performed on July 17 revealed that the child was brain dead. As there was no chance of recovery, the ventilator on which he had been placed was then turned off, and the child died several minutes later at the age of 21 months.

The sister-in-law of the child's mother talked with Hartmann while both were at the Lincoln hospital. Hartmann did not tell the sister-in-law that the child had been sick earlier in the day, but told her that when she went in to check on him, he was staring at the ceiling. Hartmann also told the sister-in-law that when she motioned her hands over the child's eyes, they did not respond.

The State called as a witness a pathologist who spends 20 percent of his time in forensic pathology (the study "used to determine the cause and manner of death in cases that involve the coroner system"). This witness had performed three to four head trauma autopsies on children and stated that in his opinion the child's death was caused by

> severe blunt traumatic injury to the back of the head. This resulted in swelling of the brain, the brain was then forced down through the opening in the spinal canal. Which is what happens when the brain can no longer — when it

swells and it has no where [sic] else to go. It attempts to get out by going out through the spinal canal and that was what caused the death of this child.

The pathologist had no opinion with regard to the manner of death, saying he could not "tell whether it was intentionally or accidentally caused." Therefore, in his mind "the manner of death remains undetermined between homicidal and accidental."

The autopsy performed by the pathologist revealed a bruising on the left cheek and an "area of bruising on the back of the head." Several additional bruises and hemorrhaging were discovered on the underside of the scalp. The pathologist testified that the fatal injury, evidenced by the fracture and large bruise, was caused by a broad, blunt type of object, not a short object or a sharp surface, and was the result of a single event. He also identified two fractures on the skull, a large one that began on the left side and ended on the right and a smaller second fracture. The pathologist did not believe that the bruises were all incurred at the same time, but were all less than a week old from the time of the autopsy.

In the pathologist's view, the "massive injury to [the] head" would have resulted in symptoms within 8 hours. He stated they could have occurred "instantaneously or up to eight hours." According to him, the effect of the injury would be an immediate unconsciousness, or it would get progressively worse, with drowsiness, vomiting, and loss of balance. In his view, once the child went into unconsciousness, the condition was irreversible. In the pathologist's opinion, the autopsy did not negate the possibility that the child's head was in motion and hit a stationary object, but he conceded that because of the brain death, the matter was inconclusive. He estimated that the cheek bruise was 24 hours to 3 days older than the bruise on the back of the head.

In conclusion, the pathologist opined that the injury could not have occurred from a simple fall, but that a child running at a high speed who fell might suffer such injuries. It was his view that in order to cause a multiple-fractured skull and to have caused the child's death, the blunt trauma had to have been of significant force.

The State also called as a witness a neuroforensic pathologist. This witness had significantly more focused experience and training in the area of head trauma than the other pathologist. She frequently lectured on head trauma, specifically in the area of child abuse and blunt trauma deaths. She is one of only five physicians in this country who are board certified in both forensic pathology and neuropathology. While this witness did not view the child's body, she reviewed the hospital records, x rays, photographs, and autopsy report.

The neuroforensic pathologist began her testimony by reviewing several studies which showed that out of over 1,000 cases of accidental head injuries involving children, 4 demonstrated only trivial fractures, and none produced neurological damage or death. This witness had no knowledge of any case wherein a child who had fallen over while standing suffered a fatal head injury. She concluded that children on their own could not develop the velocity and deceleration impact necessary to sustain a fatal head injury. Regarding the subject child's head injury, this witness testified:

> This is a very severe head injury. The amount of force applied here is quite significant. And by that I mean, not just that it broke bone, but that it caused a child to die. And we know in this day and age, that children do not die from trivial injuries, they die from significant injuries.

She was of the opinion that the child suffered "a cranial cerebral trauma, meaning that . . . the skull as well as the brain was injured." She gave the following summary of the child's injuries and the cause of his death:

> [A] tremendous blow was struck in the area where this large area of bruising is to the back of the head, that resulted in the skull fracture and that resulted in acceleration of the child's brain, that then resulted in defuse [sic] axonal injury to the cerebral hemispheres into the brain stem that subsequently caused the child's brain to swell up. Now, brain swelling, which has been discussed here in this case, simply refers to the fact that a child, or anybody that has a brain injury or any kind of problem in the brain, anything you do to the brain, the one response that the brain has is to swell up. And it's a very dangerous

thing to happen, because it's inside of a bony box and it has no place to go. So in this case, it cut off the circulation so that blood could not flow into the cranial cavity and the brain died and the child became brain dead. But that was after the fact. What started this whole line, the proximate cause of all of this was the force that was applied to the child's head that caused the brain injury itself, that then led to the brain swelling, that then led to the further complications that ensured [sic]. . . . [A]n impact was made to the back of this child's head that initiated a train of events, that once that started, could not be stopped and led to the child's dying.

According to the neuroforensic pathologist, the child's death was the result of a homicide. She stated that after the blow was struck, there was no way the child could have survived. The initial impact would result in immediate death, unconsciousness with no ability to stimulate a response, or neurological damage. This would be manifested by seizures, a stunned appearance, inability to respond normally, vomiting, and a dramatic decline until the person became unconscious. "From that time on [when injury incurred], it would only get deeper and deeper into its level of unconsciousness. By that I mean, whatever its initial level of decreased consciousness would be, it would never come back up again, it would only continue to go down." The symptoms would be immediate; the child would not be able to do anything other than lie in bed and have seizures. She stated that the child showed these conditions.

This witness also noted that the child had retinal hemorrhages in the eyes that were not a result of increased cranial pressure, but "resulted from the forces that were applied to this child's head at the time of impact."

This witness agreed with the other pathologist that the injury was caused by a blunt object such as a floor or wall, but she opined that the injury came about from the child's being thrown. According to the neuroforensic pathologist, this injury could not have been inflicted by a child, such as Hartmann's son, but only by an adult. She further disagreed with the other pathologist regarding the age of the bruises. The neuroforensic pathologist was of the view that the bruises were all of a similar

age, saying,

> I see no significant differences in the age of either of [sic] the bruise to the face or to those any place else on the head. The smaller ones may look a little bit older, but remember they are smaller and the smaller an injury is, the more — the more quickly it resolves.

The neuroforensic pathologist also observed that one fracture was complex in that it extended in several directions, and the other was linear, a single line. The fact that there was a complex fracture suggested to her that the death was not an accident. She noted that studies show that children do not suffer fractures to the back of the head by accident, but do so as the result of abuse. The neuroforensic pathologist testified that in this case there was "a complex fracture, that fracture on the left side of the occipital bone has three components to it." The additional bruises underneath the scalp suggested to her that the child had been abused. She also expressed an opinion about Hartmann's response to the child's injury. She stated that the fact Hartmann did not immediately call 911 when she first discovered the child, but waited until his mother arrived and was told to call, raised "red flags that we look at when there has been abusive injuries."

The neuroforensic pathologist was convinced that no child running and falling could generate enough force to cause injuries similar to those received by the child. She further testified that a child would have to be thrown against an object like a wall. "So we're talking about a very forceful swinging against the wall, where usually the head is actually the area of primary impact, rather than the entire body and the head just being part of it." A gentle push against the wall would not result in massive fractures. The neuroforensic pathologist concluded that the child was injured in such a fashion.

## III. ANALYSIS

### 1. CROSS-EXAMINATION

The first assignment of error questions the district court's decision to disallow cross-examining of the child's mother regarding her pending civil wrongful death action seeking damages from Hartmann, resulting from the child's injuries

and subsequent death. Hartmann claims the ruling violated her right to confront and cross-examine the mother for bias, motive, prejudice, and interest.

(a) Right to Cross-examine

U.S. Const. amend. VI and Neb. Const. art. I, § 11, guarantee an accused the right to confront witnesses. Implicit in the right of confrontation is the right to cross-examine all witnesses. *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *State v. Warford*, 223 Neb. 368, 389 N.W.2d 575 (1986). In holding that the confrontation clause is applicable to the states through U.S. Const. amend. XIV, the U.S. Supreme Court stated that "[t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). The High Court has further stated that the "right to confront and to cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials." *Lee v. Illinois*, 476 U.S. 530, 540, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986), as cited in *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990). The right to cross-examine a prosecution witness regarding bias or motive is an important interest.

> A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." . . . We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

*Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), citing 3A J. Wigmore, Evidence in Trials at

Common Law § 940 (J. Chadbourn rev. 1970). In a more recent review of the confrontation clause, the U.S. Supreme Court wrote:

> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."

*Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), quoting, in part, *Davis v. Alaska, supra.* "[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51-52, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). Thus, the denial of a criminal defendant's right to confront her or his accusers, and implicitly the right to cross-examination, see *Davis v. Alaska, supra*, is a violation of the defendant's constitutional rights. *State v. Warford, supra.*

Nebraska has no cases directly addressing the right of a criminal defendant to cross-examine a prosecution witness about a pending civil lawsuit against the defendant. However, several cases are useful in defining this court's approach to similar situations. The defendant in *State v. Rincker*, 228 Neb. 522, 423 N.W.2d 434 (1988), contended that the trial court erred in refusing to allow him to show by cross-examination that a witness for the State was on probation at the time of the crime. This court, in finding no abuse of discretion in the ruling, reasoned that since the witness was no longer on probation at the time of trial, was not an accomplice or suspect, and was not the State's only witness, "it was not error to refuse cross-examination to show that the witness" was biased. *Id.* at 532, 423 N.W.2d at 441. The *Rincker* court relied on *Davis v. Alaska, supra*, wherein the U.S. Supreme Court underscored a defendant's right to expose a witness' motivation for testifying. Although a witness' motivation is important for impeachment purposes, the burden is on the defendant to present evidence showing the source of such bias. Where there is only an

allegation of bias and no supporting evidence, such cross-examination may be prohibited. See, *State v. Harris*, 205 Neb. 844, 290 N.W.2d 645 (1980); *State v. Rice*, 214 Neb. 518, 335 N.W.2d 269 (1983).

Although no criminal cases are available in Nebraska interpreting a defendant's right to cross-examine an adverse witness about a pending lawsuit, several civil cases provide guidance. In *Hegarty v. Campbell Soup Co.*, 214 Neb. 716, 335 N.W.2d 758 (1983), the defendants challenged the district court's decision preventing defendants from cross-examining plaintiff, an employee of Union Pacific Railroad, about $162,500 he would receive from the railroad if he did not recover damages in the action. In reference to the railroad's interest in the litigation, this court said that " ' "[w]hen a party offers a witness, the relations of that witness to the thing in issue and his interest in the result become material as affecting his credibility. It is universally held that these things may be developed on cross-examination." . . .' " *Id*. at 725, 335 N.W.2d at 764. Failure to permit cross-examination constitutes reversible error if the complaining party is prejudiced. See *State v. Matejka*, 186 Neb. 454, 183 N.W.2d 917 (1971).

Additional instruction is found in *Kresha v. Kresha*, 216 Neb. 377, 344 N.W.2d 906 (1984), where we held that one party had the right to cross-examine the other regarding contemporaneous litigation involving the two. The court wrote: "The law is well settled that considerable latitude is allowed in eliciting from a witness, or in attempting to elicit and to establish, bias, hostility, or interest of the witness bearing upon his credibility." *Id*. at 387, 344 N.W.2d at 913.

A survey of other jurisdictions illustrates that a defendant in a criminal trial has a right to cross-examine an opposing witness regarding a pending civil action arising out of the same set of facts. In *Jackson v. State*, 104 Nev. 409, 760 P.2d 131 (1988), Jackson sought to reveal on cross-examination the victim's lawsuit against him. In holding that the trial court abused its discretion in prohibiting such testimony, the Nevada Supreme Court declared that "[c]ounsel must be permitted to elicit any facts which might color the witness's testimony." *Id*. at 412, 760 P.2d at 133. Other states have held similarly. E.g., *Porter v.*

*U.S.*, 561 A.2d 994 (D.C. 1989); *State v. Teeter*, 85 N.C. App. 624, 355 S.E.2d 804 (1987); *State v. Milum*, 197 Conn. 602, 500 A.2d 555 (1985); *State v. McFarlane*, 279 S.C. 327, 306 S.E.2d 611 (1983); *Arnold v. State*, 163 Ga. App. 10, 293 S.E.2d 501 (1982); *State v. Whitman*, 429 A.2d 203 (Me. 1981); *Williams v. City of Tulsa*, 623 P.2d 1037 (Okla. Crim. App. 1981). Several jurisdictions have allowed cross-examination of a witness in connection with the possibility of a civil suit. E.g., *State v. Liuafi*, 1 Haw. App. 625, 623 P.2d 1271 (1981); *State v. Whyde*, 30 Wash. App. 162, 632 P.2d 913 (1981).

In *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), the defendant attempted to cross-examine a prosecution witness regarding the state's dismissal of a witness' pending public drunkenness charge in order to show bias and motive. The trial court refused any questioning of the dismissal. The U.S. Supreme Court wrote: "By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause." 475 U.S. at 679.

"The opportunity for cross-examination, protected by the Confrontation Clause, is critical for ensuring the integrity of the factfinding process. Cross-examination is 'the principal means by which the believability of a witness and the truth of his testimony are tested.' " *Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987), quoting in part *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). In this case, evidence of the pending lawsuit was a factor the jury could properly consider in its factfinding process. Thus, the district court's ruling was an abuse of discretion and constitutes error.

### (b) Effect of Error

However, not all errors entitle a criminal defendant to the reversal of an adverse trial result. See, *State v. Lee*, 224 Neb. 216, 397 N.W.2d 48 (1986); Neb. Rev. Stat. § 29-2308 (Reissue 1989). It is only prejudicial error, that is, an error which cannot be said to have been harmless beyond a reasonable doubt,

which requires that a conviction be set aside. *State v. Chapman*, 234 Neb. 369, 451 N.W.2d 263 (1990); *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

In *Harrington v. California*, 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969), the U.S. Supreme Court announced that the denial of an opportunity to cross-examine an adverse witness does not result in prejudicial error in every case. This was reaffirmed in *Delaware v. Van Arsdall, supra*, where the High Court stated at 475 U.S. at 684: "[W]e hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis."

This court recently, in *State v. Green*, 238 Neb. 492, 471 N.W.2d 413 (1991), reaffirmed that an error in admitting or excluding evidence, whether of a constitutional magnitude or not, is prejudicial unless it can be shown that it is harmless beyond a reasonable doubt. However, "where the evidence is cumulative and there is other competent evidence to support the conviction," the improper admission or exclusion is harmless. *State v. Bradley*, 236 Neb. 371, 396, 461 N.W.2d 524, 542 (1990). In *State v. Green, supra*, a prosecution witness testified that defendant had access to the house and the dresser where drugs were found. On cross-examination, the witness invoked her fifth amendment privilege three times, leading the trial court to advise the jury to disregard all of the witness' testimony. We concluded the defendant's unfettered access to the house, the fact that defendant used the witness' dresser, and defendant's own admission before three police officers that the marijuana was his rendered the trial court's error in striking the witness' testimony harmless, as the ruling "did not materially influence the jury in a verdict adverse to a substantial right of the defendant." *Id.* at 503, 471 N.W.2d at 423. A similar outcome was reached in *State v. Bradley, supra*. In that case, the trial court permitted cross-examination of defendant concerning a visit to the victim's apartment. We rejected defendant's claim that the testimony violated his rights. In finding harmless error beyond a reasonable doubt, we concluded that defendant's testimony was cumulative since a prosecution witness provided "more direct evidence." *Id.* at

397, 461 N.W.2d at 542.

The U.S. Supreme Court, in *Delaware v. Van Arsdall, supra* at 475 U.S. at 684, identified additional factors which may be considered in determining whether there exists harmless error beyond a reasonable doubt:

> These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Several jurisdictions have addressed the matter of cross-examination about pending lawsuits to establish potential bias and motive when the witness was the defendant's victim. *State v. Rammel*, 721 P.2d 498 (Utah 1986), found harmless error in the trial court's refusal to permit the defendant to cross-examine the victim-witness about a pending lawsuit; the court stated that the "jury was well aware of [the witness'] possible motivation for testifying as he did." *Id.* at 500. The mere fact that the witness was injured by the defendant provided sufficient evidence of bias and motive. The motivation was a vindication of the witness' rights; the pending lawsuit was not the sole driving reason influencing the witness' testimony. See, also, *State v. Burris*, 131 Ariz. 563, 643 P.2d 8 (1982).

There can be no question but that the child's mother was an important witness for the prosecution in this case. She offered significant testimony about the child's prior injuries, his condition up to the time he was left with Hartmann on July 14, and his condition when she arrived at Hartmann's house after she was notified that he was sick. The child's mother's testimony accounts for 125 pages of the 833-page bill of exceptions. Except for Hartmann's inability to question the child's mother about the lawsuit, however, Hartmann had an adequate opportunity to cross-examine on all other relevant issues.

Moreover, although not expressly revealed on cross-examination, the bias, motive, prejudice, and interest of the child's mother are readily apparent. The child's death and the

fact that he died as a result of a massive concussion provides an obvious and strong impetus for her testimony. Additionally, Hartmann's mother-in-law expressed to the jury her fear that the child's parents would be bitter over the death of their son. Even if it can be said the mother was not entirely consistent in reporting what Hartmann said concerning the child's condition on the day in question, the inconsistencies are so minor that the absence of cross-examination regarding the mother's pending lawsuit cannot be said to have deprived the jury of the means by which to assess her potential bias.

It was the pathologist and neuroforensic pathologist who shed light on the question of how the child sustained the concussion which caused his death and who explained the development of the symptoms over time.. Their cross-examination was not limited in any manner, and Hartmann was able to exhaustively probe their analyses.

In no sense can it be said that the strength of the State's case against Hartmann hinged on hiding the existence of the pending lawsuit. Accordingly, we determine the district court's error in failing to permit Hartmann to cross-examine the mother about her pending lawsuit was harmless beyond a reasonable doubt.

## 2. SENTENCE

This brings us to the second and last assignment of error, the claimed excessiveness of the sentence.

It is well settled that a sentence imposed within the statutorily prescribed limits will not be disturbed on appeal absent an abuse of discretion. *State v. Kosmicki, post* p. 358, 476 N.W.2d 550 (1991); *State v. Red Kettle, post* p. 317, 476 N.W.2d 220 (1991); *State v. Heckman, ante* p. 25, 473 N.W.2d 416 (1991).

The crime of which Hartmann was adjudged guilty is a Class III felony. See § 28-305(2). Such an offense is punishable by imprisonment for a period of from 1 to 20 years, a $25,000 fine, or both such imprisonment and fine. Neb. Rev. Stat. § 28-105 (Reissue 1985). At the sentencing hearing the district court was urged not to imprison Hartmann because of her family duties and health problems, which include a recent diagnosis of an undetermined type of multiple sclerosis.

In explaining its sentence the district court observed that incarceration gives public notice that a serious wrongdoing, such as killing a 21-month-old, will result in the imposition of a severe penalty. That is to say, any lesser sentence would depreciate the seriousness of the crime and promote disrespect for the law. We cannot say that the sentence imposed constitutes an abuse of discretion.

## IV. CONCLUSION

The district court's error in limiting cross-examination being harmless beyond a reasonable doubt and the sentence imposed not being excessive, the judgment is affirmed.

AFFIRMED.