STATE OF NEBRASKA, APPELLEE,
v. CLIFFORD A. PRIVAT, APPELLANT.
556 N.W.2d 29

Filed December 6, 1996.    No. S-95-1241.

Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

GERRARD, J.

## I. STATEMENT OF CASE

Clifford A. Privat appeals his convictions, following a jury trial, for first degree murder and use of a weapon in the commission of a felony. Privat was sentenced to life imprisonment for the murder conviction and from $6\frac{2}{3}$ to 20 years' imprisonment for the use of a weapon conviction, to be served consecutively. We determine that all of Privat's assigned errors are without merit. As a result, we affirm the judgment of the district court.

## II. FACTS

Privat and his friend, Eldon Troy LeGer, along with LeGer's girl friend, decided to come to Lincoln, Nebraska, sometime in either late July or early August 1993 to look for employment. Instead of finding jobs, they spent their time partying and drinking with friends. Running low on money, Privat and LeGer hatched a plan to find somebody to "roll"—that is, someone they could beat up and rob. In furtherance of this plan, on the evening of August 3, 1993, Privat, LeGer, and another friend, Jessie Farnan, visited two Lincoln nightclubs, the Panic and the 2001 Club, searching for a victim.

Kelly Erisman, the owner of the Panic, testified that she remembered seeing LeGer and Privat at her bar on the night of August 3. She testified that LeGer did not appear to be of legal age, so she asked to see his identification and requested that he sign the "Nebraska ID book"—a book maintained by the bar to

verify identifications. After LeGer signed the ID book, Erisman said she asked him to show her his identification. LeGer produced a driver's license which obviously did not belong to LeGer. Erisman testified she remembered that the name on the license produced by LeGer was something like "Private" with the first name of Clifford.

In any event, the identification produced by LeGer indicated this person was just 19 years old, and Erisman asked the group to leave. Erisman said approximately a half hour later, around 12 to 12:15 a.m., Privat returned to her bar and again tried to gain entry. Erisman continued to refuse admission to Privat. Erisman said, after turning Privat away on this second occasion, he specifically asked her the location of a "gay bar." Erisman refused to tell Privat anything, and Privat left.

After leaving the Panic, Privat, LeGer, and Farnan found their way to the 2001 Club. It was at this bar that Privat encountered the victim, Harold Grover, while LeGer and Farnan played pool. Privat introduced Grover to LeGer and invited Grover to join them at their motel. Upon arriving at the motel, the group went upstairs to their room and began drinking beer.

After about 20 minutes, Privat noticed Grover was no longer in the motel room. Privat and LeGer left to find Grover and located him standing next to the road outside the motel. They drove up to Grover in Privat's car and offered him a ride back to his car at the 2001 Club. LeGer said that at this time, Grover got into the front seat and LeGer got into the back seat, directly behind Grover. Instead of taking Grover to his car, they took him first to a truckstop to get cigarettes and beer, and then to a parking lot at Branched Oak Lake.

Once at the lake, Privat started talking to Grover. During this conversation, Privat took off his belt and gave it to LeGer. LeGer then took the belt, put it around Grover's neck, and pulled back. The two demanded Grover's money, to which Grover at first did not respond. LeGer began to release the belt and laugh when Privat told him, "This ain't fuckin' funny" and to grab the belt tighter as "[w]e're takin' him out."

Privat began beating Grover while LeGer grabbed Grover's wallet. Privat then dragged Grover from the car, beat and kicked him, and eventually jumped on his throat. When LeGer asked

Privat what they were going to do, Privat said he was going to kill Grover and took out his pocketknife and slashed Grover's throat. LeGer then took the knife and stabbed Grover in the stomach. The two carried Grover's body into the woods and left Lincoln the next day.

Acting on a report of a missing person, the Lincoln Police Department discovered witnesses who saw Grover leave the 2001 Club with Privat and LeGer and who saw Privat and LeGer's encounter with the manager of the Panic. Det. Elgin Kuhlman contacted LeGer's mother in Kansas on a number of occasions attempting to learn of LeGer's whereabouts. LeGer eventually contacted Detective Kuhlman and agreed to return to Lincoln.

On August 26, 1993, Detective Kuhlman and Sgt. Robert Marker of the Lancaster County sheriff's office met LeGer and his girl friend as they arrived at Eppley Airfield in Omaha. LeGer agreed to show Detective Kuhlman and Sergeant Marker the location of Grover's body and to cooperate in the investigation and prosecution of Privat. As part of this cooperation, LeGer agreed to call Privat that night. This telephone conversation occurred around 4 a.m. on August 27. During this conversation, Privat made several statements implicating himself in Grover's murder.

### 1. IN-COURT IDENTIFICATION

At trial, five witnesses identified Privat as the subject of their testimony and, for the record, described his appearance and where he was seated in the courtroom. First to testify was Christal Marie Pringle. Pringle said that she and a friend were in the parking lot of the 2001 Club shortly after closing time in the early morning hours of August 4, 1993. Pringle testified that a young man who identified himself as Troy approached them and asked directions back to his motel. After describing the person who joined the conversation, the following exchange occurred between the prosecutor and the witness: "Q. Is that person here in the courtroom today? A. Yes, he is. Q. Can you tell me where he's seated and what he's wearing? A. He's sitting right over there (indicating), he's got a gray blazer on, blue striped tie, blue jeans." Pringle eventually testified that she saw

Grover in the back seat of Privat's car and that Grover was in the car as it drove away.

Tom Hall, a childhood friend of LeGer's, testified that on the evening of August 3, 1993, he had a brief conversation with LeGer outside Hall's apartment, when LeGer and two other young men unexpectedly stopped by. Hall described both men and was asked if one of them was in the courtroom, to which Hall answered, "Yes." When asked to describe where this person was sitting and what he was wearing, Hall said, "He's seated by the two attorneys, wearing a blue tie, blue jeans, white shirt, glasses."

Thomas Hamm, an investigator for the Lincoln Police Department, identified Privat as the possessor of a pocketknife taken from Privat by the Topeka Police Department when he was arrested. Hamm was asked if Privat was present in the courtroom, to which he said yes and described Privat as "seated at the defendant's table to the left of Mr. Gooch, wearing a coat and tie, blue jeans."

Erisman, owner of the Panic, was asked to tell the jury where the man who attempted to enter her bar with LeGer was seated and what he was wearing. She answered, "He's seated in that chair (pointing) right there and he's wearing a grayish suit and blue jeans and a tie." At a later side-bar discussion concerning Privat's hearsay objection to the content of the identification LeGer presented to Erisman, the following exchange occurred:

[THE COURT:] Let me touch on something different. Mr. Kelly, what good does it do to have a witness, when you ask them to see that person in the courtroom for them to respond: Yes, I do. He's wearing a gray jacket and white shirt, sitting over there. What good does that do? What relevance does that have to do with anything?

MR. KELLY: Well, Judge, in my career I've had five or six different court judges tell me five or six different ways that I'm to identify the defendant. I've had several judges specifically tell me that I'm not to comment on the record or to ask that the record will reflect the defendant as being identified. And, so, for that — I do not ask that question. . . .

THE COURT: Well, be that as it may. When she says he's sitting over there, how do I know that he isn't sitting

back in the spectator gallery as a spectator? That doesn't help the appellate court at all. You don't even have her — have him sitting at counsel table, your counsel table, theirs, or anywhere else. It doesn't mean anything.

That's completely aside from whether you ask the Court to — to have the record reflect that she's identified the defendant. If you ask me to have the record reflect that, I will do that.

But completely aside from that, her response is he's sitting over there in a gray jacket. Doesn't mean anything.

MR. KELLY: I understand. And I'll ask the question. But, I think it does have meaning on the trial level, because the triers of fact are there to make the observations. Whether or not it gets to the appellate level, I suppose I leave up to the defense attorneys.

THE COURT: Well, but it may have some relevance here.

MR. KELLY: Yes, sir.

THE COURT: You have to keep in mind the record.

MR. HAYS: I might add something, Judge. If Mr. Kelly asked that the record reflect that she's identified the defendant, I would object to that because I think that's the jury's decision to make.

THE COURT: Well, the objection is noted. It's premature at this point. So, it's overruled.

Taking his cue from the court, when the prosecutor resumed his direct examination of Erisman, the following occurred:

[Q.] I'll ask you again, can you tell me if that second individual is here in the courtroom?

A. Yes, he is.

Q. Can you tell me where he is seated?

A. He's seated right there, the third person over on the right. (Pointing).

Q. Is that at the Defense counsel table?

A. Uhm-hum; yes.

Q. Can you tell me what he is wearing?

A. He's wearing a gray jacket with blue jeans and a tie.

MR. KELLY: I'd ask the record to reflect that the witness has identified the defendant.

MR. HAYS: And I would object. I think that's a jury question.

THE COURT: The record will so reflect.

Finally, when LeGer testified, he was asked if Privat was in the courtroom today—to which he answered yes. When asked to identify him, LeGer said:

A. He's sitting over there with his attorney.

Q. What's he wearing?

A. Suit and a tie.

Q. And is he the person on the extreme right-hand side of that table?

A. Yeah.

MR. JAUDZEMIS: The record should reflect the witness has identified the defendant.

MR. HAYS: I would object.

THE COURT: The record will so reflect.

### 2. CROSS-EXAMINATION OF CODEFENDANT

The direct evidence introduced as proof of Privat's culpability was offered solely by his codefendant, LeGer. Privat's counsel aggressively cross-examined LeGer concerning his possible mendacity.

The evidence reflected that LeGer left Kansas and went to Salt Lake City, Utah, to avoid talking to the police about the disappearance of Grover. When in Salt Lake City, he asked his mother to call the shelter at which he was staying and tell them that she was LeGer's grandmother in Phoenix and that LeGer was authorized to come to Phoenix and stay with her. LeGer said the purpose of this fraud was to get the shelter to pay for his transportation to Phoenix.

LeGer admitted that on three occasions while in Salt Lake City, he had telephone conversations with his mother in Kansas, where, when she asked if he had killed a man, he lied to his mother and told her no. LeGer agreed that his motivation for contacting the Lincoln Police Department was to give them his side of the story before Privat gave them his.

LeGer admitted that the first time he talked to the Lincoln police, he did not tell them he had put Privat's belt around Grover's neck and choked him. Privat's counsel also questioned

LeGer about lying to the Lincoln police when asked whether he had gotten into trouble while working on a seismic crew with Privat in Texas. LeGer admitted to misleading the police, but denied that he had once beaten and robbed a man who was leaving a bar in Lubbock, Texas, even after being confronted by Privat's counsel with LeGer's deposition in which he admitted beating and robbing a man in Lubbock.

LeGer admitted that he did not tell the Lincoln police the first time he talked to them that it was always their plan to go to a bar to find someone to rob, and that in his deposition, he likewise denied this fact. LeGer admitted that he lied to the police when he initially told them he had no idea why Privat had asked Grover to come back to their motel or why they decided to take Grover to Branched Oak Lake. Furthermore, LeGer admitted he initially minimized the extent of his participation and overstated the extent of Privat's participation in the actual murder.

Finally, Privat's counsel attempted to question LeGer about his transfer from jail to the Lincoln Regional Center. At this point, the prosecutor asked for a sidebar and reminded the court of its motion in limine, which precluded the introduction of any evidence concerning LeGer's mental condition. This motion in limine does not appear in the record. Privat's counsel told the court that he intended to offer evidence to show that LeGer had feigned a suicide on three occasions in order to be placed in the regional center, and that he would not go into any diagnosis of LeGer's mental condition.

The prosecution then claimed any allegation of feigned suicide was unsubstantiated and demanded to know the basis for such an accusation. In response, Privat's counsel offered a letter written by LeGer to his physician at the regional center. When asked by the court whether he had seen this letter before, the prosecutor stated that he had. The letter reads as follows:

2/17/94

Dr. Martin,

The game playing is over. I've been taking up bed space and toying with my life. The suicidal acts I've already made have been made to draw attention to myself. I'm no

more suicidal than you might be and I feel the hospital is set up to help the mentally insane not someone who's facing time in the penetary [sic]. This is just a way to stay out of jail for me and I feel that I am ready to go back to jail and get on with my time. If I really wanted to kill myself I could have done it numerous other ways. So use your good judgment and figure it out.

I'm giving you my 48 hour notice to be discharged.

Let's get it on jails not going anywhere, we can't stop the inevitable.

Sincerly [sic]
Troy LeGer

2-17-94
2:33 pm

The State then attempted to claim that Privat was in wrongful possession of the letter and that receiving the letter in evidence would be a violation of the physician-patient privilege. The trial court found that the prosecutor was without authority to assert such privilege for the witness and asked both counsel if they would reserve the remainder of the cross-examination until LeGer's attorney could be contacted, so that the court could ascertain whether he wished to assert the privilege for his client. In any event, the court received the letter in evidence, but only for the purpose of showing the good faith basis of Privat's line of cross-examination.

Once LeGer's attorney was contacted, he stated his client did not waive any privileges that he may have. After further argument by counsel, the court sustained the State's objection to the receipt in evidence of LeGer's letter to his doctor, based on the fact that the trial court was of the opinion that Privat did not have a right to be in possession of LeGer's medical record and that LeGer had not waived his physician-patient privilege. Privat's counsel then made a motion to strike LeGer's testimony absent a waiver of the privilege, which the court immediately overruled.

### III. SCOPE OF REVIEW

A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is suf-

ficient to support that verdict. On a claim of insufficiency of the evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. *State v. Derry*, 248 Neb. 260, 534 N.W.2d 302 (1995).

## IV. ASSIGNMENTS OF ERROR

Privat assigns eight errors which may be consolidated into three: (1) The trial court erred in ordering the record to reflect witnesses Erisman and LeGer identified Privat in court; (2) the trial court erred in sustaining the State's objection to Privat's cross-examination of LeGer concerning LeGer's letter to his treating physician and in overruling Privat's subsequent motion to strike LeGer's testimony because Privat's right to confront a witness against him had been impaired; and (3) the trial court erred in overruling Privat's motions for mistrial and for directed verdict at the close of the State's evidence, and the verdict is not sustained by the evidence and is contrary to law.

## V. ANALYSIS

### 1. IMPROPER COMMENT BY TRIAL COURT

Privat contends that the trial judge either expressed an opinion about the evidence or that the trial judge testified as a witness when he directed the record to reflect that two witnesses described Privat when asked whether the subject of their testimony was present in the courtroom. The prejudice, Privat argues, is that the credibility of each witness is at issue and when a trial judge, in front of the jury, directs the record to reflect a witness' testimony in a certain manner, the judge has effectively removed the issue of this witness' credibility from the jury. In addition, Privat claims directing the record to reflect a fact which constitutes an element of the crime implicates his right to have each element of the crime decided by the jury.

The State counters by arguing that no error exists because the trial court did not comment on a controverted fact. Thus, the trial court did not remove from the jury's consideration an issue of fact, nor did it resolve an issue of witness credibility. Instead, the trial court simply clarified the record for the purpose of appellate review.

To establish reversible error, a defendant must demonstrate that a trial court's conduct, whether action or inaction during the proceeding against the defendant, prejudiced or otherwise adversely affected a substantial right of the defendant. *State v. Chapman*, 234 Neb. 369, 451 N.W.2d 263 (1990). Improper comments by the trial judge may be prejudicially erroneous when they tend to discredit a witness and his testimony, or when they tend to enhance a witness' credibility. *State v. Rodriguez*, 244 Neb. 707, 509 N.W.2d 1 (1993).

> As a general rule, "It is the duty of the court to abstain carefully from any expression of opinion or comment on the facts or evidence, not only in its charge to the jury . . . but also on the examination of witnesses and otherwise during the course of the trial. The trial judge should not deny the existence of any fact bearing on the innocence of accused, or make any remark or inquiry in the presence of the jury concerning matters of fact at issue which indicates his opinion as to such facts."

*Hansen v. State*, 141 Neb. 278, 286, 3 N.W.2d 441, 446 (1942). When the trial judge affects the credibility of a witness, either negatively or positively, the judge invades the province of the jury. *State v. Rodriguez, supra.*

We reject Privat's assertion that the trial court made an improper comment in front of the jury. The discussion in which the trial court suggested to the prosecutor that he should make a better record for the purposes of review was held at side-bar, outside the presence of the jurors. Before the jury, the court merely ruled on the State's request that the record should reflect the witness identified Privat by stating, "The record shall so reflect."

As a general rule, a remark by the court in admitting or excluding evidence is not prejudicial when it amounts to no more than a ruling on the question or where it is made to expedite the trial. 75 Am. Jur. 2d *Trial* § 284 (1991). " '[A] trial court generally is not impermissibly expressing an opinion when it makes ordinary rulings during the course of the trial.' " *State v. Corbett*, 339 N.C. 313, 330, 451 S.E.2d 252, 261 (1994) (quoting *State v. Weeks*, 322 N.C. 152, 367 S.E.2d 895 (1988)).

This court has consistently followed the same general rule. In *State v. Bideaux*, 219 Neb. 718, 365 N.W.2d 830 (1985), the defendant objected to the State's closing argument, asserting that the evidence did not reflect the State's argument. In ruling on the objection, the trial court stated, " 'I think the evidence does reflect it, counsel.' " *Id.* at 723, 365 N.W.2d at 834. We held the statement by the trial court to be tantamount to merely saying "overruled," and therefore it was not prejudicial to the defendant.

In contrast, in *State v. Rodriguez, supra*, during cross-examination of the only witness who could connect the defendant to the crime, defense counsel objected that a detective seated at the prosecution table was coaching the witness. The trial judge responded by stating, " 'No, he wasn't. I was watching him.' " *Id.* at 709, 509 N.W.2d at 3. We held this statement was not only an improper comment as it enhanced the witness' credibility, but it also had the effect of making the judge a witness in the trial.

The instant case is much like *Bideaux*. Here, the trial court did not comment on any fact in controversy, offer its opinion concerning the significance of the witnesses' testimony or their credibility, nor did it interject information extraneous to the witnesses' testimony in an effort to impeach or bolster their credibility.

We also reject Privat's contention that the action of the trial court affected his substantial right to have each element of the crime charged determined by the jury. This is so because Privat never claimed the witnesses' in-court identifications were of someone else or incorrect in any other way.

Five witnesses described Privat as the subject of their testimony. Four of which, Pringle, Hall, Hamm, and Erisman, used substantially the same terms to describe Privat. Three said he was wearing blue jeans and a coat and tie, and one said he was wearing blue jeans and a shirt and tie. Three also said Privat was seated at defense counsel table, and the record shows the fourth said he was sitting over there and pointed. In the instant case, the prosecutor's request that the record should reflect the in-court identification of Privat was an articulation of the obvious for purposes of appellate review.

Accordingly, we conclude that the trial court, in ruling on the State's request, neither expressed an opinion about the evidence, nor testified as a witness, under the circumstances of the instant case.

## 2. EXCLUSION OF EVIDENCE/OPPORTUNITY TO CROSS-EXAMINE

We initially note that Privat does not assign as error the trial court's refusal to receive into evidence LeGer's letter to his treating physician. Thus, for the purpose of disposing of this appeal, we assume, without deciding, that the trial court correctly excluded from evidence the letter that LeGer wrote to his doctor while confined in the Lincoln Regional Center.

However, Privat asserts that it was error to deny him a full and fair opportunity to cross-examine LeGer about the topic of the letter (i.e., feigning suicidal thoughts to stay out of jail) in order to demonstrate LeGer's propensity to lie. Privat argues that when a witness refuses to waive the physician-patient privilege in such instance, the accused is denied the opportunity for meaningful cross-examination of a witness against him. Further, Privat contends that the only remedy in such case is to exclude in its entirety the witness' testimony pursuant to our rule in *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989).

In *Trammell*, we held that where the physician-patient privilege protects from disclosure the confidential communication of a witness, and "where the witness refuses to waive the privilege, the result is that the testimony of the witness is inadmissible because the defendant is prevented from full and, perhaps, effective cross-examination of the witness." *Id.* at 142, 435 N.W.2d at 201.

However, when the object of the cross-examination is to collaterally ascertain the accuracy or credibility of the witness, the scope of such inquiry is ordinarily subject to the discretion of the trial court, and, unless abused, its exercise is not reversible error. *State v. Ballard*, 237 Neb. 729, 467 N.W.2d 662 (1991).

Thus, the issue as framed by Privat is not whether the trial court erred by excluding LeGer's letter, but, rather, whether the trial court abused its discretion in cutting off cross-examination

regarding the topic of the letter, thereby denying Privat the opportunity for meaningful cross-examination of a witness against him; if so, what remedy is then required.

The Confrontation Clause of the Sixth Amendment to the U.S. Constitution, as well as article I, § 11, of the Nebraska Constitution, guarantees one accused in a criminal prosecution the right to confront those witnesses against him. *State v. Hartmann*, 239 Neb. 300, 476 N.W.2d 209 (1991). This right of confrontation means more than merely being allowed to confront the witness physically. *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). However, the right to confront witnesses only " 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis in original.) *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (per curiam)).

In *Van Arsdall, supra*, the Court held that a defendant's rights secured by the Confrontation Clause were violated when the trial court prohibited *all* inquiry into the possibility that a witness would be biased as a result of obtaining favorable treatment from the state in regard to a different criminal matter in exchange for his testimony. The Court stated:

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska, supra*, at 318. Respondent has met that burden here: A reasonable jury might have received a significantly different impression of Fleetwood's credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination.

475 U.S. at 680.

Similarly, in *Olden v. Kentucky*, 488 U.S. 227, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988) (per curiam), the Court held that the

trial court violated the accused's right of confrontation when it kept all evidence of a rape victim's possible reason to lie from the jury. Quoting *Van Arsdall*, the Court concluded that had a reasonable jury been informed of this reason to lie, it might have received a significantly different impression of the witness' credibility.

This court has also considered this issue. In *State v. Hartmann, supra*, we held that denying a criminal defendant all opportunity to cross-examine an adverse witness in regard to that witness' pending civil lawsuit against the defendant was an abuse of discretion and violative of the defendant's confrontation right. See, also, *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994).

The common thread which runs through *Van Arsdall, Olden,* and *Hartmann* is that the accused was denied *all* opportunity to cross-examine an adverse witness in regard to a specific, prototypical form of bias. Other jurisdictions have had the occasion to consider cases where, like in the instant case, the trial court merely limited the extent to which cross-examination would be allowed in regard to the general credibility or bias of a witness on a collateral matter.

In *State v. Bogenreif*, 465 N.W.2d 777 (S.D. 1991), the defendant, an inmate in the South Dakota State Penitentiary, was convicted of aggravated assault stemming from an altercation with another inmate. At trial, the victim testified on either direct or cross-examination that he was an inmate at the penitentiary, that he was serving a sentence for grand theft, and that at the time of trial, he was a trustee assigned to a detachment unit in Yankton. On both direct and cross-examination, the victim was questioned about several letters he had written to the penitentiary authorities disclaiming responsibility for fights with other inmates, including the defendant, he predicted would occur unless he were moved. When defendant's counsel began questioning the victim in an attempt to suggest that his transfer from the penitentiary to the trustee unit was in exchange for his testimony, the court, on its own motion, overruled that particular line of cross-examination.

The South Dakota Supreme Court concluded that defense counsel had been permitted to expose to the jury facts from

which they could judge the victim's credibility. The mere fact that the defendant was not allowed to pursue a line of questioning suggesting that the altercation was initiated by the victim so that he could secure better treatment did not violate the defendant's right of confrontation. "Here, a reasonable jury probably would not have had a significantly different impression of [the victim's] credibility if the proposed line of cross-examination had been permitted." *Id.* at 782.

Likewise, in *People v Canter*, 197 Mich. App. 550, 496 N.W.2d 336 (1992), the Michigan Court of Appeals concluded a defendant's confrontation rights were not violated when the trial court allowed the defendant to inquire into many different collateral matters on cross-examination in order to challenge the witness' general credibility, but foreclosed other areas of inquiry when it involved nothing more than additional collateral matters challenging the witness' general credibility.

We are persuaded by the reasoning in the above cases and hold that an accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination. In the instant case, Privat's counsel was not absolutely prohibited from engaging in appropriate cross-examination designed to show a lack of credibility on the part of LeGer; in fact, counsel was properly granted significant latitude in challenging LeGer's general credibility.

Through effective cross-examination, Privat exposed the fact that LeGer asked his mother to lie to the people in charge of the Salt Lake City shelter at which LeGer was staying, so that the shelter would provide LeGer with busfare to Phoenix. LeGer also admitted on cross-examination that he contacted the Lincoln police in order to tell his side of the story before Privat could do so. Furthermore, cross-examination revealed that LeGer's side of the story continually evolved, at first maximizing Privat's involvement while minimizing his own. LeGer admitted, on cross-examination, lying to his mother and the

Lincoln police investigators over and over again during the course of the investigation as set forth in part II(2) above. Inquiry into LeGer's letter to his physician regarding feigned suicidal tendencies would do nothing more than incrementally cast further doubt about LeGer's general credibility based on a collateral issue.

Accordingly, we conclude that Privat's constitutional right of confrontation was not violated in the instant case, as he was not absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of LeGer. We further conclude, beyond a reasonable doubt, that a reasonable jury would not have received a significantly different impression of LeGer's credibility had Privat's counsel been permitted to pursue cross-examination on the collateral matter of LeGer's letter to his physician.

### 3. SUFFICIENCY OF EVIDENCE

Privat assigned as error that the verdict is not sustained by sufficient evidence and is contrary to law. However, the only argument offered with respect to this assignment is if LeGer's testimony is stricken, then there is insufficient evidence to sustain Privat's conviction. Absent plain error, assignments of error not discussed in the briefs will not be addressed by this court. *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993). Errors assigned but not argued will not be addressed. *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996); *Goolsby v. Anderson*, 250 Neb. 306, 549 N.W.2d 153 (1996). Accordingly, having determined that LeGer's testimony should not be stricken, coupled with the fact that there is other properly admitted evidence supporting the guilty verdict, we find there is no merit to Privat's sufficiency of the evidence claim. See *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995).

### VI. CONCLUSION

Because we conclude that all of Privat's assigned errors are without merit, as first noted in part I above, we affirm the judgment of the district court.

AFFIRMED.