KAREN L. JACKSON, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 18470

August 25, 1988                                    760 P.2d 131

*Frank J. Cremen,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City, *Rex Bell,* District Attorney, *James Tufteland,* Deputy, *Ronald C. Bloxham,* Deputy, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Sometime during the afternoon of May 19, 1984, appellant Karen Jackson shot and injured Thomas Pinsonault. A jury found appellant guilty of one count of battery with the use of a deadly weapon, and the district court sentenced appellant to a term of five years in the Nevada State Prison. The district court suspended the sentence, however, and placed appellant on probation for an indefinite term not to exceed five years. This appeal followed.

Appellant's and Pinsonault's versions of the events leading up to the shooting vary considerably. According to Pinsonault, he did not have a key to the apartment that he and appellant were sharing because his and appellant's work schedules were such that appellant was usually home when Pinsonault needed to enter the apartment. If, by chance, appellant was not home when Pinsonault arrived at the apartment, Pinsonault would enter through the bedroom window.[1] On May 18, 1984, the day before the shooting, Pinsonault twice went to the apartment to see appellant. On the first visit, approximately 5:00 p.m., Pinsonault gave appellant $80.00 toward the $89.00 weekly rent and told her that he would return later in the evening with the remainder of the rent money. Pinsonault then returned to the apartment at approximately 11:00 p.m. to leave his car so that appellant could take it to work the next day. Pinsonault testified that during this second visit, appellant demanded that Pinsonault stay the night. The couple then argued; Pinsonault threw a plate against the refrigerator and left the apartment. Pinsonault arrived at his mother's house around midnight intending to spend the night.

Pinsonault testified that approximately one hour after he arrived at his mother's house, he received a call from appellant. Appellant allegedly told Pinsonault that if he did not return to the apartment immediately, she would go to the police and file a battery complaint against him. Appellant called once again and made the same threat. Pinsonault's mother confirmed that appellant called twice during the early morning hours of May 19, 1984. Pinsonault did admit on cross-examination, however, that he had never told anyone about these telephone calls nor had he testified to these calls in the prior two trials in this matter.

The next day, the day of the shooting, Pinsonault testified that he went to the apartment at about 1:00 p.m. to get his work clothes, pay appellant the remainder of the rent money, and ask appellant if she wanted to play pinball. Pinsonault knocked on the door and received no answer. After returning to his car to obtain additional money for the rent payment, Pinsonault returned to the apartment and climbed in through the bedroom window. When Pinsonault stepped down from the window, he heard appellant call his name. Pinsonault turned and saw appellant standing in the bedroom doorway with a gun in her hand. After appellant asked Pinsonault to leave, Pinsonault turned around to climb out the window. Appellant then fired two shots at Pinsonault hitting him once in the back. Pinsonault testified that as a result of his wound, he spent almost three months in a hospital and remained in a wheelchair for a year.

---

[1] If the window was locked, Pinsonault would "jimmy" the lock.

Appellant, on the other hand, related the following version of the events. Two or three weeks prior to the shooting, Pinsonault had beaten her, so she had told Pinsonault that she wanted nothing more to do with him. For that reason, Pinsonault was not living in the apartment at the time of the shooting. On May 18, 1984, Pinsonault came over at approximately 5:00 p.m. to see if she wanted to play pinball. Before they could leave the apartment complex, however, the couple argued over a marijuana cigarette that Pinsonault had left at the apartment. Appellant had flushed the cigarette down the toilet and Pinsonault was angry. Because of the argument, Pinsonault "squealed off" in his car. Pinsonault later returned to the apartment at approximately 1:00 a.m. on May 19, 1984. Appellant attempted to keep Pinsonault out of the apartment but Pinsonault forced open the door, cutting appellant's toe. Pinsonault, still angry about the marijuana cigarette, began to assault her. Pinsonault hit appellant, kicked her, and threw a plate at her. When Pinsonault left, appellant called her parents. Appellant's parents persuaded her to file a police report concerning the incident, and her father gave her a gun for protection.

Appellant stayed home from work on May 19, 1984. Around 3:00 p.m., she heard a knock at her door. Still upset over the previous night's events, she decided not to answer the door. A short time later, appellant heard a noise coming from her bedroom. Appellant, carrying the gun, looked in the bedroom and saw Pinsonault standing by the window with a copy of the police report in his hand. Pinsonault was very angry, and he lunged at her. Appellant, fearing for her life, closed her eyes and twice fired the gun hitting Pinsonault once in the back.

Several other witnesses testified in addition to appellant and Pinsonault. Joseph Matvay, an identification specialist with the Las Vegas Metropolitan Police Department (Metro), testified that he examined the apartment after the shooting. Matvay found fragments of a broken plate in the bedroom and hallway. Matvay found appellant's fingerprints on a fragment of the plate. Matvay also found on the bed a copy of the police report that appellant had made. Metro officer Charles Jones testified that he was responding to the scene of the shooting when appellant's mother flagged him down. Appellant's mother reported that appellant had shot someone. Appellant and her father then drove up to Officer Jones' location. After being advised of her rights, appellant told Officer Jones that she had shot Pinsonault once in the back and that she hoped he would not die. Finally, appellant's mother testified that she had received a call from appellant during the early morning hours of May 19, 1984. After appellant explained to her parents that Pinsonault had beaten her, her parents drove

her to the police station to file a report. Appellant's mother had noticed some bruises and a cut toenail on appellant when she arrived that morning.

At trial, during recross-examination of Pinsonault, defense counsel asked Pinsonault if he had initiated a civil lawsuit against appellant and her parents. The district court sustained the prosecutor's objection that the question was beyond the scope of redirect examination.[2] Appellant argues on appeal that the district court improperly limited her cross-examination of Pinsonault. Specifically, appellant maintains that the district court erroneously prohibited her from exploring a potential financial interest or bias on the part of Pinsonault, *i.e.*, his lawsuit against her and her parents.

A district court's discretion to curtail cross-examination into a witness's possible bias is limited. *See* Crew v. State, 100 Nev. 38, 675 P.2d 986 (1984). Counsel must be permitted to elicit any facts which might color that witness's testimony. *Id.* at 45, 675 P.2d at 991. It cannot be disputed that Pinsonault's civil lawsuit against appellant and her parents has a direct bearing on Pinsonault's interest in the outcome of the criminal case. *See* State v. Rammel, 721 P.2d 498 (Utah 1986); State v. Burris, 643 P.2d 8 (Ariz.Ct.App. 1982). Consequently, we conclude that the district court abused its discretion by precluding defense counsel from questioning Pinsonault about the civil lawsuit.

The state maintains that any error in this regard is harmless. We disagree. In determining whether the error is harmless, we must consider whether the issue of guilt or innocence is close, the quantity and character of the evidence, and the gravity of the offense charged. *See* Big Pond v. State, 101 Nev. 1, 692 P.2d 1288 (1985). Clearly, the question of appellant's guilt was close; a previous trial in this matter ended in a mistrial after the jury became deadlocked. The evidence consisted primarily of the conflicting testimony given by appellant and Pinsonault. In addition, Pinsonault's testimony was devoid of any reference to the late night threatening phone calls allegedly made by appellant until the instant trial, which took place after Pinsonault had filed

---

[2]Our review of the record reveals that, although defense counsel attempted to explore Pinsonault's bias on recross-examination, such examination was, in effect, cross-examination. We reach this conclusion because the district court had earlier granted the state's motion to reopen its direct examination. Thus, the state's examination of Pinsonault on redirect was in the nature of a direct examination. Defense counsel was justified, therefore, in attempting to question Pinsonault regarding his potential for bias on recross-examination.

his civil lawsuit. The existence of the civil lawsuit could provide a motive for any unexplained embellishments in Pinsonault's prior accounts of the events. Finally, the fact that the district court may have properly refused to admit the civil complaint as evidence has no bearing on whether cross-examination of Pinsonault was improperly limited. Defense counsel was entitled to explore Pinsonault's potential biases separate and apart from the introduction of the civil complaint. Consequently, in the context of this case, we cannot conclude that the error was harmless.

Our disposition of this issue renders it unnecessary to discuss appellant's remaining assignment of error. For the foregoing reasons, we reverse the judgment of conviction and remand the case for further proceedings consistent with this opinion.