LLOYD JONES, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 21960

August 20, 1992 837 P.2d 1349

*Ward & Maglaras,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, and *Chris Owens,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Lloyd Jones (Jones) was charged with trafficking in a controlled substance and conspiracy to possess or sell a controlled substance, as a result of his alleged participation in a sale of methamphetamine to James Vaccaro (Vaccaro), an undercover narcotics officer. The only non-circumstantial evidence implicating Jones at trial was the testimony of Vaccaro and the other arresting officers. Vaccaro testified that on or about January 26, 1989, he received a telephone call from an informant suggesting that he call another number and ask to speak to "Blaze." Blaze was later identified as Robert LaPalme (LaPalme), Jones' co-defendant in this action. Vaccaro telephoned LaPalme and asked to purchase two pounds of methamphetamine. Vaccaro testified that he and LaPalme agreed that the purchase price would be $10,000 per pound, and that the transaction would take place the following day.

On January 27, 1989, Vaccaro met with LaPalme at LaPalme's apartment, after telephoning him a second time to see if he had had an opportunity to contact "Mike," his drug connection. The two men then drove to a mobile home owned by Jones' co-defendant, Mike Neathery (Neathery). Vaccaro testified that he and LaPalme were admitted into the trailer by a woman, who told them that Neathery was in the back room. Vaccaro further testified that LaPalme went into the back room and returned with a sawed-off rifle, with which he directed Vaccaro towards the back room. He stated that Neathery and Jones were already present in that room, and that the four men discussed the availability of the methamphetamine. Vaccaro alleged that when he asked about the quality of the methamphetamine, Jones stated that it was very good. Furthermore, Vaccaro testified that when he agreed to meet Neathery and Jones at the Showboat Hotel to carry

out the exchange, he was told that Neathery would carry out the transaction but that Jones would also be present to safeguard the security of the deal.

Officer Vaccaro went into the Showboat Hotel and towards the main bar as planned, and saw Neathery and Jones approaching the bar from the other direction. Vaccaro testified that as he made eye contact with Neathery, Jones walked off in another direction. Neathery and Vaccaro made the exchange, and then Vaccaro gave the arrest signal. While other officers were arresting Neathery, Vaccaro apprehended Jones, with the assistance of Officer Huggins. Vaccaro testified that he and Huggins identified themselves as police officers, that Huggins showed Jones his badge, and that Huggins was armed. He stated that Jones then reached for a revolver that was tucked beneath Jones' waistband. Vaccaro testified that he and Huggins wrestled Jones to the ground in order to secure the revolver, and that in so doing, he struck Jones a number of times in the face with a closed fist. Vaccaro also testified that it took six or seven officers to subdue Jones, remove his gun, and handcuff him. Officer Huggins transported Jones alone in his vehicle from the Showboat Hotel to the jail. Huggins testified that although Jones was handcuffed, Huggins was forced to further subdue him because he was still fighting, kicking, and biting.

At trial, both Jones and his girlfriend testified on Jones' behalf. Jones, girlfriend, Yvonne Maness (Maness), testified that she had been dating Jones for nine years, and that they had lived together in Las Vegas during most of that time. Jones and Maness have a son, Trevor, who was five years old at the time of Jones' arrest. Maness also has three other children who are not related to Jones. She testified that on the day of the arrest, her fourteen-year-old daughter, Nicki, had not returned from school on the school bus as expected. She testified that she, Jones, and Trevor had gone to Neathery's trailer to look for Nicki, because Nicki frequently baby-sat for Neathery's two children. She stated that Neathery was in the back room of the trailer when they arrived, and that Neathery called to Jones from the back room to tell him to come look at a book about Vietnam. Officer Vaccaro was also present in the back room at that time. Maness testified that she was with Jones virtually the entire time Jones was in the back room, and that she did not hear him talk about drugs.

Maness testified that later that night, she, Jones, and Trevor went to the Showboat Hotel to look for her daughter, Nicki, because Nicki's friend's parents bowled in a 9:00 p.m. bowling league there. She further testified that Mike Neathery had requested a ride to an unnamed bar earlier in the day, and that although she had refused his request, she had offered to take him

as far as the Showboat Hotel. Maness and Jones returned to Neathery's trailer that evening and gave him a ride to the Showboat Hotel. Maness testified that while Jones went to look for Nicki, she remained in the car with their son, Trevor, who has a medical condition requiring constant supervision. She also testified that Jones' shirt was tucked in when he left, and that she did not notice the bulge of a gun in his waistband.

Jones testified in his own defense, stating that he had been regularly employed prior to his arrest, and that Maness' testimony accurately reflected what had occurred on the day of his arrest. Jones also testified that Officer Vaccaro had lied when he said that Jones had been a participant in a discussion regarding the sale of drugs and that LaPalme was carrying a sawed-off rifle at the trailer. Furthermore, Jones testified that he did not have a gun when he was at the Showboat Hotel, and that he struggled with the arresting officers because the officers did not identify themselves. Jones also testified that in addition to being beaten by the police officers while in the hotel, he was severely beaten by Officer Huggins in the police car on the way to the jail. The jail refused to accept Jones because of his injuries, and he was taken to a medical clinic, where he received stitches for a cut he received above his eye. Finally, Jones testified that several days after being returned to the jail, he experienced convulsions, began to slip in and out of consciousness, and was taken to the University Medical Center for X-rays and a CAT scan.

Neither Jones' nor Vaccaro's testimony was supported by testimony from neutral third parties. Although both patrons and security guards were present in the casino of the Showboat Hotel when the arrest occurred, none were questioned. Furthermore, the officers failed to maintain a credible chain of custody on the gun, even though proof that Jones was carrying a gun would have helped to justify the beatings he received. The gun was never dusted for fingerprints; and initially at trial, the gun was believed to have been unavailable. The police report given to Jones' counsel indicated that the gun had been lost or stolen. However, the prosecutor told the court that this information was incorrect, and that the gun had been turned over from the police department to its rightful owner, who had since moved to Montana and was not available to testify. In addition, the prosecutor stated that the Metropolitan Police Department (MPD) did not know who had turned the gun over to its owner, and that there was no officer available who could testify to the fact that MPD had ever had the gun in its possession.

Because Jones' counsel refused to stipulate to the existence of the gun, the court directed the prosecutor, Owens, to provide some type of factual support for his claim that the gun existed.

Thereupon, the prosecution produced Willie Bates, MPD's evidence custodian, who testified that his records showed that the gun impounded in this case was marked with serial number 158-11143 and had been released to Lorraine Leaver, a former employee of the North Las Vegas Police Department. Then, Detective Daniel Harry testified that they had in fact just located a gun with that serial number on it in an unsealed evidence bag in MPD's evidence vault. Finally, Detective Fielding, who was present at the Showboat Hotel at the time of Jones' arrest, testified that he recognized the unsealed evidence envelope as the one into which he had placed the gun that Dectective Manning had pulled out from underneath Jones during the struggle. Fielding further testified that although he was present at Jones' arrest and saw Manning remove the gun, he could not remember what type of shirt Jones was wearing and was somewhat uncertain as to whether Jones' shirt was untucked.

Jones was convicted by a jury on the charges of trafficking in a controlled substance and conspiracy to possess or sell a controlled substance. He appealed these convictions, arguing that the district court erred in granting Neathery's request to invoke his Fifth Amendment right to remain silent when called as a witness in Jones' trial. Neathery had been charged as a co-defendant with Jones and had pleaded guilty. He was informed that by pleading guilty, he was relinquishing his Fifth Amendment right not to testify. After having pleaded guilty but before being sentenced, Neathery was called by the prosecution to be a witness in Jones' trial. After answering a few preliminary questions, Neathery refused to answer a question concerning the conversation in his trailer on the grounds that his answer might incriminate him. A bench conference was held in which Neathery reluctantly expressed concern over the outcome of his sentencing hearing and the possibility that he might subsequently be prosecuted for perjury. He also expressed a general concern for his personal safety. The court permitted Neathery to refuse to testify. Sometime after the conclusion of the trial, Jones' counsel obtained a declaration from Neathery stating that the reason he refused to testify was that he had been coerced by the investigating officers, and that if he had testified, he would have stated that Jones was not involved in the drug sale.

A defendant's objections to a witness's wrongful assertion of the privilege against self-incrimination may not be entertained on appeal absent a timely challenge by the party presenting the witness. Oliver v. State, 85 Nev. 418, 425, 456 P.2d 431, 435 (1969). In the instant case, the State called Neathery as a witness and offered a contemporaneous challenge to Neathery's refusal to

testify. Jones' counsel also took part in the discussion regarding whether Neathery should be permitted to invoke the protection of the privilege. Therefore, we conclude that this issue was properly preserved for review.

Witnesses in criminal prosecutions have a Fifth Amendment right to refuse to answer questions when their answers might subject them to future prosecution. Baxter v. Palmigiano, 425 U.S. 308, 316 (1976). However, assertion of the Fifth Amendment privilege requires more than a vague and subjective fear of prosecution. Hoffman v. United States, 341 U.S. 479, 486 (1951). In *Oliver,* this court stated that Oliver's co-defendant could not assert the privilege against self-incrimination to avoid testifying at Oliver's trial merely because his testimony might tend to incriminate him in his application for probation. *Oliver,* 85 Nev. at 425, 456 P.2d at 435. At the time he was called to testify, Oliver's co-defendant had pleaded guilty but had not yet been sentenced. *Id.* Similarly, in this case, Neathery was asked to testify at a time when he had pleaded guilty but had not been sentenced. In accordance with our holding in *Oliver,* we hold that it was error to permit Neathery to claim the protection of the privilege against self-incrimination when called to be a witness in Jones' trial.

With respect to whether this error was prejudicial, although the exonerating testimony of a co-defendant who has already been sentenced should normally be viewed with some skepticism, the believability of such testimony in the instant case is enhanced by Neathery's allegations that he was coerced by the investigating officers in a case involving behavior that might subject the officers to civil liability. These allegations are supported by the State's admission that Owens and Vaccaro questioned Neathery outside the presence of Neathery's attorney and without his attorney's permission, even though Neathery was still a co-defendant in the case and in apparent violation of Supreme Court Rule 182. Because this alleged violation of Rule 182 supports the credibility of Neathery's post-trial statements and casts doubt upon the credibility of the State's witnesses, and because the State's case against Jones depends exclusively on the credibility of the witnesses for both parties, we conclude that the district court's error was potentially prejudicial and warrants reversal.

In addition, Jones asserts that his motion for a new trial should have been granted pursuant to NRS 176.515(1), which provides

for new trials based on newly discovered evidence. *See Oliver,* 85 Nev. at 424, 456 P.2d at 435; Pacheco v. State, 81 Nev. 639, 408 P.2d 715 (1965). In Burton v. State, 84 Nev. 191, 196, 437 P.2d 861, 864 (1968), under factual circumstances similar to those of the instant case, the appellant requested a new trial based upon newly discovered evidence suggesting that Burton's co-defendant, who had pleaded guilty to the crime charged, would have testified on Burton's behalf. This request was denied, because the court found that Burton could have obtained the testimony of his co-defendant through due diligence prior to the trial. *Id.* However, in the present case, Jones' counsel attempted to elicit testimony from Neathery by issuing a subpoena to him prior to the trial, but was informed that Neathery would elect to remain silent. Jones maintains that his reliance upon Neathery's statement that he would remain silent was reasonable because he had no way of knowing that this silence was coerced. We believe that the unusual circumstances of this case, involving allegations of impropriety, distinguish it from *Burton,* and that Jones' request for a new trial should therefore have been granted.

Jones also argues that the district court erred when it refused to allow Jones to cross-examine Detective Vaccaro about allegations of impropriety lodged against him in a three-year old federal case in which Vaccaro was also an undercover informant. Jones sought to impeach Detective Vaccaro's credibility by showing that his testimony in that case was contradicted by that of another witness. A subsequent investigation revealed that the allegations against Vaccaro were groundless, and there was no resulting judicial action. Therefore, limiting cross-examination on this point was within the district court's discretion.

Finally, Jones contends that the trial court erred in refusing to allow him to produce evidence at trial concerning the nature and severity of the injuries he received from the arresting officers. Although Jones was permitted to mention the beatings he received from the police officers, he was not allowed to go into specific detail concerning their severity or his claim that the beatings occurred predominantly outside the Showboat Hotel, rather than inside the hotel at the time of his arrest. Jones was also not permitted to produce medical records describing the extent of his injuries. Jones argues that introduction of this evidence was necessary to establish that the police officers involved in this incident had an unusually compelling motivation to lie. Specifically, he asserts that his injuries were so severe that without a conviction, the individual police officers involved would be exposed to potential civil liability.

When the purpose of cross-examination is to expose bias, a trial court is not accorded the usual breath of discretion in determining whether to entertain the questioning. Crew v. State, 100 Nev. 38, 45, 675 P.2d 986, 990-91 (1984). Counsel must be permitted to elicit any facts which might color a witness's testimony. *Id.; see also* Jackson v. State, 104 Nev. 409, 412-13, 760 P.2d 131, 133-34 (1988). Although, in this case, Jones did not seek to introduce evidence of his injuries during cross-examination, his purpose in introducing this evidence was similar: to prove that the officers involved in the arrest may have been motivated to lie by the possibility that they might be exposed to civil liability for the beatings. Therefore, we conclude that it was error to prohibit Jones from introducing evidence demonstrating the extent of his injuries.

For the foregoing reasons, we reverse the judgment of the district court and remand this case for retrial in accordance with this opinion.

MOWBRAY, C. J., concurring.

I agree with the majority that several legal errors plagued appellant's trial, and that these errors necessitate a retrial. My complaint is with the majority's predilection for overstating appellant's position.

This case, tried before a jury, involved conflicting testimony. In exaggerating that testimony supporting appellant's version of events while deprecating, if not dismissing, that favorable to the State, the majority disdains the jury, which, exercising its prerogative, *see, e.g.,* Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981), resolved questions of testimonial weight and credibility in favor of the State. Even more vexing, I suspect that the majority's advocacy on behalf of the appellant will hamstring the State's efforts to retry him.