*1239 OPINION

Per Curiam:

In 1994, John Coleman (“Coleman”), the forty-three-year-old victim in this case, traveled to Reno with his wife and two children to attend his aunt’s eightieth birthday party. Coleman and his family remained in the Reno area for approximately one month after the birthday celebration.
On September 15, 1994, Coleman, who was one-quarter Native American, set out to find a Native American friend from a previous Reno visit by the name of “Chief.” To find Chief, Coleman *1240 sought assistance from several transients living along the Truckee River. The first people Coleman encountered were transients John Lomas (“Lomas”), Debra Lupe (“Lupe”), and another unspecified acquaintance of theirs. Coleman provided the group with money to buy alcohol and cigarettes, and the group started drinking and walking together along the riverfront. Eventually, they came to the camp of several Native Americans.
Appellants Louis Delmar Pacheco (“Pacheco”) and Robert Steven Buff (“Buff”) resided at the camp, along with Arnold Davis (aka “Iron”) and his niece, Eileen Davis (“Eileen”). At trial, Iron testified that the group was “basically family,” as Pacheco and Buff were blood relatives of some sort. When Coleman and his group of new acquaintances approached the camp, Pacheco, Buff, and the others were in the process of leaving. They indicated that Coleman and his group could “party” at the campsite while they were away.
Several hours later the inhabitants of the camp, including appellants, returned. Lomas and Lupe testified that they sensed some tension and hostility and decided to leave the camp, suggesting that Coleman do the same. However, because Coleman was intoxicated and had not yet found his friend, he decided to stay at the camp.
There are conflicting accounts as to what happened next.[1] Iron testified at trial that shortly after Lomas and Lupe left the camp, Coleman and Pacheco engaged in a verbal altercation. According to Iron, the argument started after Coleman said he was Native American and Pacheco said that Coleman was a white man. When the verbal fight ended, Pacheco began to hit Coleman’s head against the rocks. Pacheco also held Coleman’s head back, exposing his neck, and yelling: “I’ll kill you.” At that time, Pacheco also yelled, ‘ ‘Do it,’ ’ to Buff, who was nearby, apparently in order to encourage Buff to kill Coleman. Buff then pulled a Swiss army knife from his right hand pocket and indicated to Pacheco that he would do so. Buff “brought the knife up with both hands” and plunged it into Coleman’s throat. Coleman bled to death within fifteen to twenty minutes.
Thereafter, the camp broke up, and the group scattered. Leland Dement (“Dement”), a transient, found Coleman dead and immediately contacted the police. The police issued a bulletin for two Native American men and one female. That night the police apprehended Buff, who was with Iron and Eileen, and transported all three to civil protective custody because of their level of intoxication. The police took samples of their clothes, shoes, hair, and *1241 blood for future testing. Pacheco was apprehended shortly thereafter. ■
The police declared the campsite a crime scene, roped off the area, and began a forensic investigation. They located a Swiss army knife, footprints in the dirt, and blood splatters.
On September 16, 1994, the coroner concluded that the cause of death was multiple stab wounds to the neck. DNA testing concluded that Pacheco’s jeans and shoes contained blood that could not exclude Coleman as the donor. Similarly, blood was found on the Swiss army knife that could not exclude Coleman as the donor. Also, forensic evidence confirmed that the footprints found at the scene were Pacheco’s.
On July 28, 1995, Pacheco filed a motion for severance pursuant to NRS 174.165(1). The district court denied the motion.
Approximately twenty-four witnesses testified at trial. Among them were James Whiteface (“Whiteface”) and Iron. In sum, their testimony indicated that Pacheco held down and hit Coleman against the rocks and that Buff killed Coleman by stabbing him in the throat with a Swiss army knife. Neither Pacheco nor Buff testified at trial.
The jury returned verdicts of murder in the first degree with the use of a deadly weapon as to both defendants.
At the penalty hearing, the defense argued for life with the possibility of parole. Both Buff and Pacheco testified. Although Buff never denied killing Coleman, he could not remember anything about the incident.
Pacheco was sentenced to life in the Nevada State Prison without the possibility of parole. That sentence was enhanced with a consecutive term of life without the possibility of parole for the use of a deadly weapon. Pacheco was given credit for 408 days time served.
Buff was also sentenced to life in Nevada State Prison without the possibility of parole and given the same sentence enhancement as Pacheco. Buff was given credit for 413 days time served.
Buff and Pacheco filed this timely appeal. They maintain that five assignments of error warrant reversal of their convictions and a new trial: that the district court erred by (1) concluding as a matter of law that a Swiss army knife is a deadly weapon, (2) instructing the jury on the deadly weapon enhancement, (3) admitting the preliminary hearing transcript of witness Whiteface, (4) instructing the jury on the concept of malice, and (5) instructing the jury on premeditation.
Appellant Pacheco maintains that six separate errors warrant reversal of his conviction and a new trial: that the district court erred in instructing the jury on reasonable doubt; that Pacheco was prejudiced by a State’s witness’s comment at trial regarding *1242 Pacheco’s assertion of his Miranda rights; that the district court erred in restricting his cross-examination of a State’s witness; that the district court erred in refusing to allow Pacheco to admit an out-of-court statement made by Buff; that the district court erred in denying his motion for severance; and that the district court erred in the admission of DNA evidence.
Having considered appellants’ contentions and having had the benefit of oral argument, we conclude that (1) the deadly weapon enhancement jury instruction violated the rule announced in Zgombic v. State, 106 Nev. 571, 576, 798 P.2d 548, 551 (1990), and accordingly, we remand the deadly weapon sentence enhancement issue to the district court for a new sentencing hearing. We further conclude that the errors implicating the Fifth and Sixth Amendments of the United States Constitution have occurred warranting a new trial for Pacheco.

DISCUSSION

Standard of review

A reviewing court will not disturb a verdict on appeal if it is supported by sufficient evidence. Domingues v. State, 112 Nev. 683, 693, 917 P.2d 1364, 1371 (1996).

The deadly weapon enhancement

Appellants contend that the deadly weapon sentence enhancement must be vacated because the district court erroneously concluded that a Swiss army knife is a deadly weapon under NRS 193.165[2] and erroneously instructed the jury on the deadly weapon enhancement.
*1243 To determine whether an instrumentality is a deadly weapon for purposes of the enhanced sentence statute, the instrumentality must satisfy the inherently dangerous weapon test. See Zgombic, 106 Nev. at 576, 798 P.2d at 551 (overruling “functional test” set forth in Clem v. State, 104 Nev. 351, 760 P.2d 103 (1988)); see also NRS 193.165. A weapon is inherently dangerous under this analysis if, when “used in the ordinary manner contemplated by its design and construction, will, or is likely to, cause a life-threatening injury or death.” Zgombic, 106 Nev. at 576-77, 798 P.2d at 551.
Denying the defense’s pre-trial motion on the matter, the district court concluded as a matter of law that the Swiss army knife used to kill Coleman was a deadly weapon under Zgombic. Subsequently, however, the district court gave an instruction on the definition of a deadly weapon, thereby submitting the sentence enhancement issue to the jury. Generally, it is the district court’s duty to determine whether the instrument is an inherently dangerous weapon. Zgombic, 106 Nev. at, 577, 798 P.2d at 551-52. However, “in a few close cases where the court cannot determine as a matter of law whether the weapon is or is not a deadly weapon, the judge will need to submit the entire issue to the jury after instructing it on the previously stated definition of a deadly weapon.” Id. at 552.
We conclude that the matter at bar presents the type of “close case” anticipated in Zgombic, and the district court could not determine as a matter of law that the Swiss army knife used by appellants was a deadly weapon.[3] While it was improper for the *1244 district court to make its own legal conclusion with respect to the Swiss army knife, we conclude that any initial error was cured when the district court subsequently submitted the deadly weapon enhancement issue to the jury.
We further conclude, however, that the district court’s instruction on the deadly weapon sentence enhancement misstated the law as set forth in Zgombic,[4] Under Zgombic, the district court must instruct the jury as follows:
[A] deadly weapon under NRS 193.165 is any instrumentality which is inherently dangerous. Inherently dangerous means that the instrumentality itself, if used in the ordinary manner contemplated by its design and construction, will, or is likely to, cause a life-threatening injury or death.
Zgombic, 106 Nev. at 576-77, 798 P.2d at 551.
In the case at bar, the district court instructed the jury that “A deadly weapon is any object, instrument, or weapon which is designed in such a manner as to be capable of producing, and likely to produce, death or great bodily injury.” We conclude that this instruction erroneously advised the jury that the Swiss army knife was a deadly weapon under the “functional” test. Because the jury was not correctly instructed, we conclude that the issue of appellants’ deadly weapon sentence enhancement must be remanded for a new trial.

Pacheco’s motion for severance

Pacheco argues that the district court erred in denying his motion for severance and, as a result, he received an unfair trial in violation of the Sixth Amendment. Specifically, Pacheco argues that the joint trial resulted in a denial of Pacheco’s right to introduce exculpatory evidence. We agree.
*1245 NRS 174.165(1) provides that the trial judge may sever a joint trial if “it appears that a defendant or the State of Nevada is prejudiced by a joinder of offenses or of defendants in an indictment or information, or by such joinder for trial together.” The decision to sever a joint trial is vested in the sound discretion of the district court and will not be reversed on appeal unless the appellant “carries the heavy burden” of showing that the trial judge abused his discretion. Amen v. State, 106 Nev. 749, 755-56, 801 P.2d 1354, 1359 (1990). This court has held that “[sjome form of prejudice always exists in joint trials and such occurrences are subject to harmless error review.” Ewish v. State, 110 Nev. 221, 234, 871 P.2d 306 (1994); see NRS 178.598 (any trial defect not impacting substantial rights is disregarded); and Mitchell v. State, 105 Nev. 735, 738-39, 782 P.2d 1340, 1342-43 (1989) (harmless error standard applied to joinder of claims; court tacitly recognized that same standard applied to joinder of defendants).
In the instant case, due to the district court’s denial of Pacheco’s motion for severance, Pacheco was precluded from introducing into evidence Buff’s initial statement to the police, in which he exonerated Pacheco in the killing. Accordingly, due to Pacheco’s inability to get this critical evidence before the jury, we cannot say that the district court’s denial of Pacheco’s motion for severance was harmless. Therefore, we conclude that the district court should have severed the joint trial so as to diminish the possibility of prejudice to either defendant in proving their theory of the case.

Refusal of exculpatory evidence

Shortly after his arrest, Buff gave a recorded statement to Detective Rucker. In that statement, he admitted killing Coleman, but stated that his accomplice was Arnold Davis, not Pacheco:
Q: Okay, so then why don’t you tell me what’s goin’ on?
A: Why don’t you . . . why don’t you go look for Mr. Arnold Davis [aka Iron] as well.
Q: Mr. Davis, why? What ... did Mr. Davis do?
A: Because he was my accomplice.
Q: He was your accomplice? And what way was he your accomplice?
A. He’s the one that caught the man, and held him down.
This powerful admission by the person who exerted the fatal force, naming someone other than Pacheco as his accomplice, was never heard by the jury. The district court erroneously ruled that this statement was hearsay and precluded it from being recounted *1246 at the trial. Since the statement was obviously relevant and constituted the main thrust of Pacheco’s defense, the district court committed reversible error in not permitting this statement to be admitted as evidence at trial.
Hearsay is defined as “a statement offered in evidence to prove the truth of the matter asserted.” NRS 51.035. A hearsay statement against one’s penal interest is admissible if the declarant is unavailable at trial, and if the statement was against the declar-ant’s penal interest when made. NRS 51.345(l)(b); see also Walker v. State, 113 Nev. 853, 863, 944 P.2d 762, 768 (1997). A declarant is considered unavailable where, among other reasons, the declarant is “[ejxempted by ruling of the judge on the ground of privilege from testifying concerning the subject matter of his statement.” NRS 51.055(1)(a). However, a “statement tending to expose the declarant to criminal liability and offered to exculpate the accused in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.” NRS. 51.345(1)(d).
Here, Buff’s statement, although hearsay, was admissible pursuant to the statement against interest exception codified at NRS 51.345(1). Buff’s statement was contrary to his penal interest, and, by invoking his Fifth Amendment right not to testify, Buff was unavailable at trial pursuant to NRS 51.055(l)(a). Further, Buff’s statement was sufficiently corroborated through Iron’s and Whiteface’s initial statements to the police, in which both men indicated that Pacheco had nothing to do with Coleman’s murder. Had Buff’s statement been received into evidence as it properly should have, the prejudice created by a joint trial would have been greatly reduced. By preventing Pacheco from introducing Buff’s exculpatory and otherwise admissible statement, the district court deprived Pacheco of a fair trial by frustrating his ability to defend himself. This alone constitutes reversible error. See State v. Mabuti, 807 P.2d 1264, 1269 (Haw. 1991) (holding that a similar statement against interest implicating co-defendant and exculpating defendant was admissible under statute similar to NRS 51.345).

Remaining allegations of error

Pacheco also complains that it was error to: (1) admit the preliminary hearing transcript of Whiteface’s testimony, (2) permit a comment by the police that Pacheco could not be interviewed because he asserted his right to remain silent, and (3) prevent Pacheco from showing that both Whiteface and Iron were incarcerated as material witnesses and, therefore, biased.
Whiteface had witnessed the killing and testified at the prelim *1247 inary hearing as to what he observed. He testified on direct examination and was effectively cross-examined. Part of this cross-examination concerned his initial statements to police in which he indicated that Pacheco had nothing to do with the killing. The prosecutor then tried to rehabilitate the testimony of Whiteface on redirect examination and repeatedly refreshed his memory with his prior testimony. Exasperated by the tediousness of extracting this testimony, the prosecutor offered the entire preliminary hearing transcript which included the testimony of Whiteface and the district court admitted it into evidence. This transcript also included the testimony of Debra Roupe, John Lomas, Leland Dement, Iron Davis and Detective Ronald Dreher.
The admission of Whiteface’s preliminary hearing testimony violated Pacheco’s Sixth Amendment confrontation rights because Whiteface was available at trial and could have testified consistently with his preliminary hearing testimony once his memory was refreshed. See Power v. State, 102 Nev. 381, 384, 724 P.2d 211, 213 (1986) (holding that the district court’s admission of the transcript of a witness’s preliminary hearing testimony violated the defendant’s Sixth Amendment right of confrontation because the State failed to demonstrate that the witness was actually unavailable at the time of trial). Further, the district court’s admission of the entire preliminary hearing transcript prejudiced Pacheco’s defense because of the concern that the jury would review it and place undue emphasis on that prior testimony above other testimony received at trial, including cross-examination by the defense. Whiteface and Iron were critical witnesses to the State’s case and were held in jail as material witnesses. Both had made initial statements to police indicating that Pacheco was not an accomplice in the killing, but both had changed their story when testifying at the preliminary hearing and trial. It was important to Pacheco to expose the potential bias that incarceration had on the testimony of these two witnesses.
When the purpose of cross-examination is to expose bias, a trial court is not accorded the usual breadth of discretion in determining whether to entertain the questioning. Crew v. State, 100 Nev. 38, 45, 675 P.2d 986, 990-91 (1984). Further, “counsel must be permitted to elicit any facts which might color a witness’s testimony.” Id.; see also Jones v. State, 108 Nev. 651, 659, 837 P.2d 1349, 1354 (1992); Jackson v. State, 104 Nev. 409, 412-13, 760 P.2d 131, 133-34 (1988).
The State would have suffered little prejudice in showing the incarceration status of Whiteface and Iron, except for the inference that these witnesses had to be incarcerated to ensure their testimony. The jury should have known that the incarceration sta *1248 tus of Whiteface and Iron, along with their attendant bias, might have been the reason they had changed their version of the facts. Since these were critical witnesses to the State, failure to allow permissible impeachment was reversible error.
In the direct examination of Det. Ron Dreher, the prosecutor inquired as to Pacheco’s condition when he was arrested and asked if Det. Dreher had been able to interview Pacheco at that time. The detective stated that Pacheco appeared to be intoxicated and that he was not able to interview him. The prosecutor then asked Det. Dreher why he was not able to interview Pacheco. Det. Dreher stated the reason was because Pacheco had invoked his Miranda rights. This was not an inadvertent slip informing the jury that Pacheco had invoked his constitutional rights to remain silent, but rather, a direct solicitation of this information by the prosecutor from a law enforcement officer. While counsel for Pacheco failed to object, this oversight does not preclude our review of plain error that is of constitutional dimensions. See McCullough v. State, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983).
It is well settled that the Fifth Amendment to the United States Constitution, incorporated to the states through the Due Process Clause of the Fourteenth Amendment, forbids a prosecutor from commenting on the accused’s silence. See Brecht v. Abrahamson, 507 U.S. 619 (1993) (holding that use for impeachment purposes of a defendant’s silence at time of arrest and after receiving Miranda warnings violated due process and is characterized as trial error).
We conclude that Buff’s and Pacheco’s remaining allegations lack merit and do not warrant discussion.
Accordingly, we hereby (1) affirm Buffs conviction, and remand that matter solely on the issue of the applicability of the deadly weapon sentence enhancement; and (2) reverse Pacheco’s conviction and remand his case for a separate trial on the underlying murder charge. On remand, the enhancement issue with regard to the charges against Pacheco should also be litigated in accordance with this opinion.

 Much of the ambiguity probably can be attributed to the fact that all participants and witnesses were, admittedly, highly intoxicated.

 NRS 193.165(1) provides in pertinent part:
[A]ny person who uses a firearm or other deadly weapon ... in the commission of a crime shall be punished by imprisonment in the state prison for a term equal to and in addition to the term of imprisonment prescribed by statute for the crime.
The 1995 legislature, in response to Zgombic, amended NRS 193.165 to read, in relevant part:
5. As used in this section, “deadly weapon” means:
(a) Any instrument which, if used in the ordinary manner contemplated by its design and construction, will or is likely to cause substantial bodily harm or death;
(b) Any weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death; or
(c) A dangerous or deadly weapon specifically described in NRS 202.255, 202.265, 202.290, 202.320 or 202.350.
*1243 The editor’s note to NRS 193.165 provides: “The amendatory provisions of this act do not apply to a crime committed before October 1, 1995.” The crime in this case took place on September 15, 1994. Therefore, the unamended statute, in effect on September 15, 1994, applies, and not the statute as amended by the legislature. Accord Milton v. State, 111 Nev. 1487, 1494, 908 P.2d 684, 689 (1995) (amendments to NRS 193.165 not controlling as to crime committed before October 1, 1995).

 While we need not review the district court’s legal conclusion on the merits, we note that this court has never held that as a matter of law a Swiss army knife is an inherently dangerous weapon. In fact, this court has never held that knives are presumptively deadly weapons under the inherently dangerous test. See Collins v. State, 111 Nev. 56, 888 P.2d 926 (1995) (holding that exacto knife is not a deadly weapon for purposes of sentence enhancement); Bradvica v. State, 104 Nev. 475, 477, 760 P.2d 139, 140 (1988) (holding that a folding pocket knife with a locking blade was not a dirk or dagger for purposes of NRS 202.265 and NRS 202.350, enumerating dangerous bladed *1244 weapons prohibited from being possessed, manufactured, or carried). Instead, this court has held that “[i]n determining whether a knife is a deadly weapon, the district court must consider the particular type of knife that was used in the crime and determine whether it satisfies the ‘inherently dangerous weapon’ test.” Milton, 111 Nev. at 1495, 908 P.2d at 689.

 We note that appellants failed to raise the jury instruction issue at trial. The record in this case does not reflect that either Buff’s or Pacheco’s lawyers objected to this instruction or offered an alternative. See Etcheverry v. State, 107 Nev. 782, 784-85, 821 P.2d 350, 351 (1991) (failure to object to jury instruction at trial bars appellate review). However, it is well settled that this court can address plain error sua sponte. Pertgen v. State, 110 Nev. 554, 560, 875 P.2d 361, 362 (1994).