State of Nebraska, appellee, v.
Peter Francis Draper, appellant.
___ N.W.2d ___

Filed January 9, 2015.    No. S-13-991.

1. **Constitutional Law: Witnesses: Appeal and Error.** An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.

2. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination.

3. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.

4. **Motions for New Trial: Appeal and Error.** A trial court's order denying a motion for new trial is reviewed for an abuse of discretion.

5. **Trial: Prosecuting Attorneys: Witnesses: Self-Incrimination: Appeal and Error.** Under *Namet v. United States*, 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963), when a prosecutor calls a witness to the stand with the knowledge that the witness will invoke the privilege against self-incrimination, reversible error exists either when the prosecution makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege or when inferences from a witness' refusal to answer adds critical weight to the prosecution's case in a form not subject to cross-examination.

6. **Trial: Courts: Witnesses: Self-Incrimination.** Absent extraordinary circumstances, trial courts should exercise their discretion to forbid parties from calling witnesses who, when called, will only invoke a privilege.

7. **Constitutional Law: Criminal Law: Trial: Witnesses.** The Confrontation Clauses of U.S. Const. amend. VI and Neb. Const. art. I, § 11, guarantee the right of an accused in a criminal prosecution to be confronted with the witnesses against him or her.

8. **____: ____: ____: ____.** The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, means more than being allowed to confront the witness physically.

9. **Constitutional Law: Witnesses.** The purpose of the right of confrontation is primarily to guarantee a right for the accused to cross-examine witnesses against him or her.

10. **Constitutional Law: Testimony: Evidence.** The Confrontation Clause was designed to prevent depositions or ex parte affidavits from being used against a prisoner in lieu of a personal examination and cross-examination of the witness, and courts must interpret the Sixth Amendment with this focus in mind.

11. **Trial: Courts: Witnesses.** Pursuant to Neb. Evid. R. 611, Neb. Rev. Stat. § 27-611 (Reissue 2008), courts limit cross-examination of witnesses to the subject matter of the direct examination and matters affecting the credibility of the witness.

12. **Criminal Law: Appeal and Error.** Not all trial errors, even trial errors of con-stitut onal magnitude, entitle a criminal defendant to the reversal of an adverse trial result.

13. **Appeal and Error.** When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case.

14. **Convictions: Appeal and Error.** It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside.

15. **Courts: Trial: Witnesses: Evidence.** *Namet v. United States*, 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963), instructs courts to consider the invocation of a privilege within the entire context of the case and other evidence presented to the jury.

16. **Constitutional Law: Trial: Witnesses.** The right to cross-examine a witness is critical for ensuring the integrity of the factfinding process and is an essential requirement for a fair trial.

17. **Trial: Motions to Strike: Jury Instructions: Presumptions.** An objection fol-lowed by an admonition or instruction is typically presumed to be sufficient to dispel prejudice.

18. **New Trial: Appeal and Error.** While any one of several errors may not, in and of itself, warrant a reversal, if all of the errors in the aggregate establish that a defendant did not receive a fair trial, a new trial must be granted.

19. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it.

20. **Criminal Law: Evidence: New Trial: Appeal and Error.** Upon finding revers-ible error in a criminal trial, an appellate court must determine whether the total evidence admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict.

21. **Evidence: New Trial: Double Jeopardy: Appeal and Error.** If evidence is not sufficient to sustain a verdict after an appellate court finds reversible error, then double jeopardy forbids a remand for a new trial.

Appeal from the District Court for Franklin County: STEPHEN R. ILLINGWORTH, Judge. Reversed and remanded for a new trial.

Charles D. Brewster, of Anderson, Klein, Swan & Brewster, for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, MCCORMACK, MILLER-LERMAN, and CASSEL, JJ.

Heavican, C.J.

## NATURE OF CASE

Peter Francis Draper was convicted in the district court for Franklin County, Nebraska, of intentional child abuse resulting in death and intentional child abuse resulting in serious bodily injury. Draper appeals his convictions. Because of cumulative error concerning both the Confrontation Clause under the Sixth Amendment and Neb. Evid. R. 513, Neb. Rev. Stat. § 27-513 (Reissue 2008), we reverse the convictions and remand the cause for a new trial.

## BACKGROUND

This case involves the alleged abuse and subsequent death of 2-year-old Joseph Rinehart, Jr. (Joe Jr.). Draper was Joe Jr.'s maternal grandfather. Laura Rinehart, Joe Jr.'s mother, and Nancy Draper (Nancy), Draper's wife and Joe Jr.'s grandmother, were also both charged and convicted of related crimes.

The Drapers lived in a three-bedroom mobile home in Naponee, Franklin County, Nebraska. In March or April 2011, Rinehart and her husband, along with their four children, moved from Racine, Wisconsin, to Naponee. The Rineharts moved into the Drapers' residence. At the time of trial, the Rineharts' surviving three children ranged in age from 2 to 6 years old. In June or July, Rinehart's husband moved out of the house, and at the time of trial, Rinehart and her husband were "going through a separation" but were not yet divorced.

In exchange for a lighter sentence, Rinehart agreed to testify against Draper and Nancy. At trial, Rinehart gave accounts of various times Draper allegedly abused Joe Jr. This abuse purportedly resulted in several different severe injuries to Joe Jr. over the year prior to his death. According to Rinehart, the discipline administered by Draper that eventually caused Joe Jr.'s death occurred on April 25, 2012. Rinehart testified that she saw Draper "pin" Joe Jr. down on a bed with his knee in Joe Jr.'s stomach and groin area. Rinehart testified that she saw Draper do this three different times.

After this incident, Joe Jr.'s condition began to deteriorate. Rinehart and Nancy took Joe Jr. to the hospital at

approximately 6 p.m. on Monday, April 30, 2012. Rinehart told hospital staff that Joe Jr. had diarrhea and had been vomiting for the last several days. When the doctor on call for the hospital arrived, he ordered an x ray of Joe Jr.'s abdomen. The x ray came back negative for injuries, and Joe Jr. was treated for constipation. He was given fluids, mineral oil, and a glycerin suppository. He was then discharged from the hospital.

Rinehart testified that on the ride home from the hospital, Joe Jr. started to breathe strangely and became nonresponsive. After they arrived home, Joe Jr. started having what Rinehart described as a seizure and eventually he stopped breathing. Joe Jr. was brought back to the hospital at approximately 7:55 p.m. Joe Jr. was not breathing when he arrived at the hospital and staff attempted to perform cardiopulmonary resuscitation. Joe Jr. was declared deceased at 8:41 p.m.

After Joe Jr.'s death, hospital staff contacted the Franklin County sheriff's office. Investigators from the Nebraska State Patrol, along with a deputy from the Franklin County sheriff's office, interviewed Draper, Nancy, and Rinehart at the Draper residence the night of Joe Jr.'s death. Draper told law enforcement that Joe Jr. and his brother had a "bone disease." Draper denied that Joe Jr.'s death was caused by physical violence. He did admit that he, Rinehart, and Nancy were the only people who looked after Joe Jr.

An autopsy was performed shortly after Joe Jr.'s death. The cause of death was determined to be multiple blunt force trauma of the head, trunk, and extremities. The manner of death was ruled to be homicide. Post mortem CT scans on Joe Jr. revealed numerous injuries, including a lateral skull fracture, a perforated bowel, a fractured pelvic bone, and healed-over rib fractures. The skull fracture and pelvic bone fracture appeared to have occurred within the previous 2 weeks. The skull fracture was likely caused by "direct, broad force against the skull." Several bruises on Joe Jr.'s body were documented and were determined to have developed within 24 hours of his death. There was also severe swelling of Joe Jr.'s brain and an excessive amount of bleeding in his abdominal cavity.

After the autopsy, on May 2, 2012, all three adults were interviewed by law enforcement again at separate locations. Rinehart described how Draper put his knee in Joe Jr.'s abdomen, but did not offer any other instances of potential abuse by Draper. After this second round of interviews, all three were arrested. On May 3, while in custody, both Rinehart and Nancy were interviewed again. This time, Rinehart gave a full account of the alleged abuse committed by Draper against Joe Jr. and the other children. Nancy stated that she felt safer telling the truth knowing that Draper had been arrested.

On June 21, 2012, Draper was charged with committing, on or between April 23 and 30, intentional child abuse resulting in death. On January 22, 2013, the State filed a second-amended complaint which, in addition to the original count, also charged Draper with committing, on or between July 12, 2011, and April 22, 2012, intentional child abuse resulting in serious bodily injury. A jury trial began on May 6, 2013.

In his testimony at trial, Draper denied all the allegations of abuse against him. He stated that he did not handle the majority of the discipline and that it was Rinehart who primarily disciplined the children. Draper argued that because he had multiple sclerosis, he would not have been able to press his knee into Joe Jr. on the bed the way Rinehart described. Draper could not provide any explanation as to how Joe Jr. received his injuries.

At trial, the State intended to call Nancy to testify for the State's case in chief. The record on appeal indicates that counsel for Nancy informed both the trial court and the State that Nancy intended to exercise her Fifth Amendment privilege against self-incrimination if she were to be called as a witness.

Immediately prior to Nancy's testimony, the trial court, the attorney for Draper, and the attorney for the State had a sidebar. Draper's counsel stated that it was his "understanding that Nancy . . . intends to invoke the Fifth Amendment." Draper's counsel argued that having the jury hear her invoke the Fifth Amendment, considering her relationship to Draper, would have an unfairly prejudicial effect on the jurors. In response, the State informed the judge that it planned to offer use

immunity to Nancy pursuant to Neb. Rev. Stat. § 29-2011.02 (Reissue 2008), which provides that a court may grant a witness use immunity "[w]henever a witness refuses . . . to testify . . . ." The State argued that it could do so only after Nancy claimed the privilege and that it needed to be done in the presence of the jury.

After the trial court took a recess to review § 29-2011.02, counsel for Draper again warned the trial court that after speaking with Nancy's counsel, he believed that Nancy "intends to plead the Fifth Amendment." Draper's counsel again reiterated that Nancy's claims of privilege would be prejudicial toward Draper, "especially if she decides she's not going to testify after she's offered immunity by the State." The trial court ruled that Nancy must first assert her right not to testify before immunity could be granted. The trial court stated that he "d[id]n't see" Nancy's invoking the privilege in the presence of the jury "as being inflammatory on that basis." The trial court allowed the State to call Nancy as a witness.

Nancy was then called to testify in the presence of the jury. After Nancy invoked her privilege against self-incrimination, the State made a motion asking the trial court to confer immunity. The trial court informed Nancy that none of her testimony could be used against her in another court proceeding. After this, Nancy continued to refuse to testify and only responded by again reasserting her privilege against self-incrimination. The trial court then proceeded to allow the State to treat Nancy as a hostile witness and ask her leading questions. After each refusal, the trial court ordered Nancy to testify, but never held her in contempt.

In total, the State asked four leading questions which essentially amounted to repeating inculpatory statements against Draper that Nancy had made in her confession to investigators. Draper's counsel objected multiple times to the continued questioning of Nancy. After Nancy continued to refuse to testify, the trial court excused the witness. Draper's counsel did not request to cross-examine the witness or object to her being excused. Draper's counsel requested that the trial court admonish the jury "to disregard what the State's attorney said to her

that she wouldn't answer." The trial court overruled Draper's motion and did not so admonish the jury.

In its opposition to Draper's motion for new trial and in its brief on appeal, the State argues that Draper procured Nancy's refusal to testify. In support of its opposition to Draper's motion, the State produced a letter written by Draper to Nancy before she was to give her testimony. In the letter, Draper reminds Nancy of a conversation their attorneys had with each other in which Nancy's attorney notified Draper's attorney of Nancy's intention to assert her Fifth Amendment privilege if she were called to testify.

The State referred to Nancy's refusal to testify twice during its closing argument. The State asked the jury how the injuries could have occurred to Joe Jr. in a way other than how Rinehart explained them, suggesting that there was no other credible explanation for the origin of the injuries. The State said that "he [Draper] denies it. Nancy . . . won't tell you." Later during the State's rebuttal argument, the State even more directly referenced Nancy's testimony: "Why do you think [Draper] on May 2 sent a letter to Nancy . . . , his wife, reminding her not to testify? Encouraging her not to testify at his trial? Think about that." Draper did not object to either statement.

After the close of evidence, Draper requested the trial court to instruct the jury to disregard Nancy's testimony. The proposed instruction informed the jury that it was "not to consider this act by this witness as evidence against [Draper], or any of the questions asked of the witness as evidence against [Draper]." The trial court rejected the proposed instruction.

The jury returned a verdict of guilty on both counts. After the verdict, Draper filed a motion for new trial. He argued that the trial court erred in (1) allowing the State to call Nancy as a witness with the knowledge that she was going to invoke her Fifth Amendment privilege against self-incrimination; (2) allowing the State to continue to ask Nancy leading questions, in spite of her refusal to answer; and (3) refusing to give Draper's proposed jury instruction regarding Nancy's testimony. The trial court denied Draper's motion. Draper was

sentenced to 60 years' to life imprisonment for child abuse resulting in death and to 49 to 50 years' imprisonment for child abuse resulting in serious bodily injury, the sentences to be served consecutively. Draper appeals.

## ASSIGNMENTS OF ERROR

Draper assigns as error, consolidated, restated, and reordered, that the trial court (1) erred in allowing the State to call Nancy to testify in the presence of the jury, knowing she would invoke her Fifth Amendment privilege against self-incrimination; (2) erred in allowing the State to treat Nancy as a hostile witness and continue to ask leading questions even after she refused to testify; (3) erred in violating the Confrontation Clause of the Sixth Amendment by dismissing Nancy as a witness without giving Draper an opportunity to cross-examine her; (4) erred when it failed to admonish the jury, both during trial and after the close of evidence, to draw no inference from Nancy's invocation of her right against self-incrimination; (5) erred in overruling Draper's motion for new trial; (6) erred in finding sufficient evidence to support Draper's convictions; and (7) erred by sentencing Draper to an excessive sentence, contrary to Nebraska law.

## STANDARD OF REVIEW

[1] An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.[1]

[2] Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination.[2]

[3] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[3]

---

[1] *State v. Kitt*, 284 Neb. 611, 823 N.W.2d 175 (2012).

[2] *State v. Smith*, 286 Neb. 77, 834 N.W.2d 799 (2013).

[3] *State v. Merchant*, 288 Neb. 439, 848 N.W.2d 630 (2014).

[4] A trial court's order denying a motion for new trial is reviewed for an abuse of discretion.[4]

## ANALYSIS

Draper's primary argument on appeal concerns Nancy's testimony. Draper assigns that the trial court erred in allowing Nancy to be called to testify in the presence of the jury, knowing that she would invoke her Fifth Amendment privilege against self-incrimination; in allowing the State to continue to question Nancy while she refused to testify; in denying Draper the right to conduct cross-examination; and in failing to admonish or instruct the jury not to draw an inference from Nancy's refusal to testify. Draper also assigns that the trial court abused its discretion in denying Draper's motion for new trial on substantially these same grounds.

*Constitutional Background.*

Two different U.S. Supreme Court opinions are relevant to Draper's claim. Taken together, *Namet v. United States*[5] and *Douglas v. Alabama*[6] provide the framework for our analysis of Draper's assigned errors under the Confrontation Clause of the Sixth Amendment. The two opinions address different, but related, factual scenarios relevant to Draper's assigned errors. The Court in *Namet* addressed when and under what circumstances a witness' invocation of a privilege in the presence of the jury would constitute reversible error. Applying the principles of *Namet*, the Court in *Douglas* then addressed when a witness' refusal to give any testimony, by invoking a privilege, may deprive the defendant of his or her rights under the Confrontation Clause.

Our analysis begins with *Namet*. In that case, the defendant was accused of operating a gambling ring.[7] The prosecution's

---

[4] *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008).

[5] *Namet v. United States*, 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963).

[6] *Douglas v. Alabama*, 380 U.S. 415, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965).

[7] *Namet, supra* note 5.

theory was that the gambling took place at several stores and that the defendant went to each store every day to collect the bets and pay off the winners. One of the stores in question was owned by a husband and wife, both of whom were also charged in relation to the gambling ring. On the day of the defendant's trial, both the husband and wife pleaded guilty to their charges, and both were called to testify at the defendant's trial. Both witnesses gave extensive testimony. The husband testified that he did have dealings with the defendant and had accepted wagers in the store. Although the two witnesses invoked their privileges against self-incrimination multiple times, the defendant did not object to any of the questions or request any curative instructions.

[5] In its decision in *Namet*, the U.S. Supreme Court described two circumstances when the prosecutor's calling a witness to the stand with the knowledge that the witness would invoke the privilege against self-incrimination constituted reversible error.[8] The first category, based upon prosecutorial misconduct, involved situations when the prosecution "makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege."[9] The second category involves cases in which "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant."[10]

The Court, in *Namet*, quickly determined that the case did not constitute prosecutorial misconduct under the first prong, and primarily addressed the case through the "critical weight" analysis. Under the second prong of *Namet*, reversible error does not exist when the inferences are "'no more than minor lapses through a long trial.'"[11] The Court held that the defendant's "substantial rights" were not impacted by the

---

[8] *Id.*

[9] *Id.*, 373 U.S. at 186.

[10] *Id.*, 373 U.S. at 187.

[11] *Id.* (quoting *United States v. Hiss*, 185 F.2d 822 (2d Cir. 1950)).

witnesses' refusals to testify.[12] The prosecutor had a legitimate reason for calling the witnesses, because they possessed substantial nonprivileged information. The Court also determined that the "lengthy nonprivileged testimony" the witnesses gave minimized the prejudicial nature of the few times the witnesses invoked the privilege.[13] In the context of the testimony of the two witnesses, the limited instances when the witnesses refused to testify were not the "chief source" of the inference that they had engaged in criminal activity with the defendant.[14] According to the Court, the nonprivileged testimony given by the two witnesses was already sufficient to create that inference.

Also important to the Court's decision in *Namet* was that instructions or other curative devices would or should have been available had the defendant requested them at trial. Not only did the defendant fail to request a curative instruction, he actually relied on the invocation of the privilege in his argument to the jury. The Court declined to hold that the trial court must, sua sponte, take some action to remedy the invocation of the privilege in the presence of the jury. But the Court suggested that a proper instruction to the jury to disregard a witness' invocation of any testimonial privilege would be sufficient to cure what would otherwise be a prejudicial error.

Although the U.S. Supreme Court in *Namet* did not expressly mention the Confrontation Clause, the Court subsequently acknowledged and applied the constitutional foundation of that case in *Douglas*.[15] In *Douglas*, the State called a codefendant to testify at trial. Because the codefendant had already been convicted, but planned to appeal the case, his attorney advised him to invoke his privilege against self-incrimination when asked any questions. The judge told the witness that he could

---

[12] *Id.*, 373 U.S. at 191.

[13] *Id.*, 373 U.S. at 189.

[14] *Id.*

[15] *Douglas, supra* note 6.

not invoke his privilege because he was already convicted and ordered him to testify. The judge declared him a hostile witness and permitted the State to read from a confession made by the witness, pausing every so often to ask the witness if he made the statement the prosecutor just read. The witness continued to assert his privilege not to testify. Through this method, the State read the entire confession into evidence, even though the confession itself was inadmissible under state law.

The Court held that because the prosecutor "was not a witness, the inference from his reading that [the witness] made the statement could not be tested by cross-examination."[16] Likewise, the statements imputed to the witness were not subject to cross-examination, because the witness never admitted to making them. The defendant was deprived of his Sixth Amendment right to confront the witness through cross-examination, because the witness gave no testimony upon which a cross-examination could be based. Because the jury was still exposed to the statements allegedly made by the witness, the prosecutor was effectively able to circumvent the requirements of the Confrontation Clause.

Relying on *Namet*, the Court considered the weight the statements made by the prosecutor played in the case. The alleged statements by the witness were the only pieces of direct evidence linking the defendant to the crime. The statements also provided "a crucial link in the proof both of petitioner's act and of the requisite intent to murder."[17] The Court found that the statements "clearly bore on a fundamental part of the State's case" and, quoting *Namet*, determined that "[t]he circumstances are therefore such that 'inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'"[18] With this background in mind, we will next address each error Draper has assigned.

---

[16] *Id.*, 380 U.S. at 419.

[17] *Id.*

[18] *Id.*, 380 U.S. at 420.

*Allowing Nancy to Assert Her*
*Privilege in Jury's Presence.*

[6] Draper assigns that the trial court erred when it permitted Nancy to assert her privilege against self-incrimination in the presence of the jury. Consistent with *Namet* and its progeny, the Nebraska Evidence Rules, contained in chapter 27 of the Nebraska Revised Statutes, as well as our case law interpreting those rules, direct trial courts to avoid a jury's exposure to a witness' claim of privilege whenever possible. Section 27-513(2) provides that "proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury." "'[A]bsent extraordinary circumstances, trial courts should exercise their discretion to forbid parties from calling witnesses who, when called, will only invoke a privilege.'"[19]

The State acknowledges that Nancy did assert her Fifth Amendment privilege before the jury and that the jury was aware Nancy intended to do so before Nancy ever took the witness stand. The State nevertheless argues that because it had offered Nancy immunity, § 27-513(2) was no longer applicable, and that there was no error in the district court's actions.

But the State's offer of immunity did not override the purpose of § 27-513(2). The purpose of that subsection is to prevent the jury from drawing an unfavorable inference from a witness' assertion of a privilege. Such purpose applied notwithstanding the State's intent to offer immunity. Nancy was called to testify when all parties knew that she would, before being granted immunity, invoke her privilege against self-incrimination. And the record fails to establish any basis justifying the assertion of that privilege in front of the jury.

The evidence in the record on appeal in this case does not rise to the level of "extraordinary circumstances" that would make it impracticable for the privilege to be asserted outside the jury's presence.[20] Nancy and her counsel were available,

---

[19] *State v. Robinson*, 271 Neb. 698, 725, 715 N.W.2d 531, 556 (2006).

[20] See, *id.*; § 27-513(2).

as well as Draper and his counsel. All parties knew of Nancy's likely refusal to testify and could have been prepared for a determination outside the presence of the jury. The remaining question would have been whether Nancy would continue to refuse to testify after she was granted use immunity. A determination outside the presence of the jury would have provided the opportunity to answer that question.

Section 27-513(2) requires only that the privilege must be claimed, absent extraordinary circumstances, "without the knowledge of the jury." Although trial courts in Nebraska have had witnesses assert a privilege at a hearing outside the jury's presence,[21] a hearing is not absolutely required to comply with § 27-513(2). In jurisdictions that do mandate such a hearing, we note that the basic requirements are quite simple.[22] The witness must be given the opportunity to either testify or invoke a privilege. The State may then request the trial court to offer the witness immunity. The trial court is then able to determine whether the witness intends to continue to refuse to testify and must decide whether it would be prejudicial to the defendant for the witness to be called in front of the jury. At the same time, the trial court may also consider whether the failure to call the witness, despite the refusal to testify, would unfairly prejudice the State.[23]

Section 27-513(2) makes it clear that courts must avoid having witnesses claim privileges in the presence of the jury whenever practicable. And § 29-2011.02 contains no requirement that a witness first invoke a privilege in front of the jury in order for immunity to be provided. In this case, all parties knew, at the very least, that Nancy would invoke the privilege before being granted use immunity. The trial court failed to fully comply with the requirements of § 27-513(2) and allowed Nancy to assert her Fifth Amendment privilege without giving Nancy the opportunity to assert her privilege outside the presence of the jury.

---

[21] *Robinson, supra* note 19.

[22] See *id*.

[23] See *United States v. Vandetti*, 623 F.2d 1144 (6th Cir. 1980).

*Deprivation of Draper's Right
to Confront Nancy.*

[7-10] Draper assigns that the trial court erred when it did not allow Draper to cross-examine Nancy. The Confrontation Clauses of U.S. Const. amend. VI and Neb. Const. art. I, § 11, guarantee the right of an accused in a criminal prosecution to be confronted with the witnesses against him or her. "The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings . . . , 'means more than being allowed to confront the witness physically.'"[24] The purpose of the right of confrontation is primarily to guarantee a right for the accused to cross-examine witnesses against him or her.[25] In particular, the Confrontation Clause was designed "'to prevent depositions or *ex parte* affidavits [from] being used against the prisoner in lieu of a personal examination and cross-examination of the witness . . . .'"[26] We must interpret the Sixth Amendment "'with this focus in mind.'"[27]

The State argues that Draper waived this argument when he failed to object or request cross-examination at trial. However, as in *Douglas*, the nature of the State's questioning itself left no meaningful opportunity for cross-examination. Recall that in *Douglas*, the Court determined that the witness was not available for cross-examination, because the witness actually gave no testimony.

[11] In the same way, Draper was not afforded the right to cross-examine the witness, because Nancy did not actually testify at all. Pursuant to Neb. Evid. R. 611, Neb. Rev. Stat. § 27-611 (Reissue 2008), courts limit cross-examination of witnesses to the subject matter of the direct examination and matters affecting the credibility of the witness.[28] The scope of

---

[24] *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) (citation omitted).

[25] *Id.*

[26] *Douglas, supra* note 6, 380 U.S. at 418-19. See, also, *State v. Leibel*, 286 Neb. 725, 838 N.W.2d 286 (2013).

[27] *Leibel, supra* note 26, 286 Neb. at 731, 838 N.W.2d at 293.

[28] *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

cross-examination was limited to Nancy's answers, of which there were none, and would not extend to the prosecutor's statements. Draper was already deprived of his rights under the Confrontation Clause when the prosecutor was allowed, through leading questions, to read statements in front of the jury that Nancy had made during her confession, while Nancy continued to refuse to testify.

Additionally, a defendant's rights under the Confrontation Clause do not turn upon the validity of the asserted privilege. The Court in *Douglas* did not reach the question of whether the witness properly invoked his privilege, because "[i]t is sufficient for the purposes of deciding petitioner's claim under the Confrontation Clause that no suggestion is made that [the witness'] refusal to answer was procured by the petitioner . . . ."[29] Since *Douglas*, courts appear to be in agreement that the principal inquiry is whether the defendant had a meaningful opportunity for cross-examination, not whether the witness made a valid assertion of a privilege.[30]

The State, in its brief, argues that Draper is responsible for Nancy's refusal to testify. In *Douglas*, the Court noted that the witness was acting in his own self-interest not to testify, and not out of a desire to protect the defendant.[31] The State alleges that Draper convinced or coerced Nancy into not testifying against him through a letter written by Draper to Nancy before she was to give her testimony at his trial. But the record shows that the letter was written after Nancy's lawyer had already informed Draper's attorney that Nancy intended to invoke the privilege at Draper's trial. In the letter, Draper is essentially just reminding Nancy about the conversation between their attorneys. It is unclear from the letter what initially led to her decision not to testify, but it appears that Nancy and her attorney had already made the decision by the time Draper wrote his letter. Considering the entire letter and

---

[29] *Douglas, supra* note 6, 380 U.S. at 420.

[30] See, e.g., *U.S. v. Torrez-Ortega*, 184 F.3d 1128 (10th Cir. 1999).

[31] *Douglas, supra* note 6.

the facts before us, the record is insufficient to establish that Draper was responsible for Nancy's refusal to testify.

Although this case is not as extreme as *Douglas*—when the prosecutor essentially read a witness' entire confession—Draper was nevertheless deprived of his right to cross-examine the witness. Allowing the State to read statements allegedly made by the witness on a prior occasion over that witness' refusal to testify is a violation of the Confrontation Clause. The trial court erred when it allowed the State to continue to question Nancy using leading questions while she insisted on refusing to testify after being granted use immunity.

We note that the trial court's error does not automatically constitute reversible error. The Court in *Douglas* still applied the *Namet* critical weight analysis to determine whether reversible error existed. We will follow the same approach.

*Trial Court's Failure to Instruct*
*Jury Pursuant to § 27-513(3).*

Draper assigns that the trial court erred when it failed to admonish the jury after Nancy left the stand and failed to instruct the jury not to draw an inference from Nancy's refusal to testify after the close of evidence. Arguably, either an admonishment or a curative instruction would have been sufficient, under *Namet*, to cure any prejudice to Draper through Nancy's assertion of privilege and refusal to testify.[32] Nebraska law directs trial courts to give curative instructions in cases such as these. Section 27-513(3) provides that "[u]pon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom." And the ability of the trial court to admonish the jury as to the proper or improper use of evidence is well settled.[33]

Draper's requested instruction would have met the requirements of § 27-513(3). Even though Draper's requested

_____

[32] See *Namet, supra* note 5.

[33] See, e.g., *Wamsley v. State*, 171 Neb. 197, 106 N.W.2d 22 (1960); *Grandsinger v. State*, 161 Neb. 419, 73 N.W.2d 632 (1955).

instruction does not mention the term "inference," Draper's instruction accomplished the same thing when it directed the jury "not to consider this act by the witness as evidence against [Draper]." The trial court erred when it failed to either admonish the jury or comply with § 27-513(3) by providing a curative instruction regarding Nancy's assertion of privilege and testimony, or lack thereof.

*Reversible Error.*

[12-15] We must finally determine whether the errors by the trial court constitute reversible error. "Not all trial errors, even trial errors of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result."[34] "When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case."[35] "It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside."[36]

We begin with the first prong of the *Namet* analysis—situations involving prosecutorial misconduct. There is nothing in the record to suggest that the State made a conscious and flagrant attempt to build its case out of inferences arising from Nancy's use of the privilege. While it is true that the State knew Nancy was likely to invoke the privilege, as the Court noted in *Namet*, the State "need not accept at face value every asserted claim of privilege."[37] The fact that the State actually requested the trial court to grant Nancy immunity for her testimony suggests the State's intent in calling her was to elicit nonprivileged testimony. And the State may have called Nancy so that the district court would hold her in contempt for refusing to testify despite the provision of immunity. The State's

---

[34] *State v. Lara*, 258 Neb. 996, 1002, 607 N.W.2d 487, 491 (2000).

[35] *Robinson, supra* note 19, 271 Neb. at 710, 715 N.W.2d at 547.

[36] *State v. Aguilar*, 264 Neb. 899, 910-11, 652 N.W.2d 894, 904 (2002).

[37] *Namet, supra* note 5, 373 U.S. at 188.

purpose in calling Nancy was not solely for her to invoke the privilege in the jury's presence. Therefore, this case does not fall under the first prong of *Namet*.

[15] The Court's analysis in *Namet*, under the second prong, instructs us to consider the invocation of the privilege within the entire context of the case and other evidence presented to the jury. Since *Namet*, courts have distilled the Court's "critical weight" analysis into several factors: whether the State knew the witness would invoke the privilege, the number of questions that elicit an assertion of the privilege, whether the inferences are merely cumulative of other evidence, whether the inferences relate to central or collateral matters, whether either side attempted to draw adverse inferences in closing argument or at any other time during trial, and whether the jury was instructed not to draw an inference from the witness' refusal to testify.[38] We concur with the reasoning of these courts and analyze accordingly.

In this case, the substance and manner of the State's examination following Nancy's refusal to testify establish that Draper was unfairly prejudiced. The subject of the State's questioning directly related to matters central to Draper's guilt or innocence. The statements read by the State corroborated Rinehart's testimony and filled an obvious gap in the State's case. Even though the State presented a litany of experts and other witnesses for its case in chief, Rinehart was the only witness to give an account of who actually injured Joe Jr. Without Nancy's statements, the case largely came down to Draper's word against Rinehart's.

[16] Draper was no doubt prejudiced when the trial court allowed the State to continue to question Nancy using leading questions after Nancy refused to testify. Draper was denied the right to cross-examine the statements read by the State. And we have stated that the right to cross-examine a witness is "'critical

---

[38] See, e.g., *U.S. v. Victor*, 973 F.2d 975 (1st Cir. 1992); *Rado v. State of Conn.*, 607 F.2d 572 (2d Cir. 1979); *Fletcher v. United States*, 332 F.2d 724 (D.C. Cir. 1964).

for ensuring the integrity of the factfinding process'"[39] and is
""'"an essential requirement for a fair trial.""'"[40]

Further, the facts of this case also depart from *Namet* in
several key aspects. Nancy did not give any nonprivileged tes-
timony at all, unlike in *Namet*, where the witnesses gave ample
nonprivileged testimony to offset their refusals to testify.[41]
Here, the only exposure the jury had to Nancy was through
her refusal to testify. Also in *Namet*, the prosecutors made no
reference to the witnesses' invocation of the privilege for the
duration of the trial, and the defense actually relied upon the
witnesses' refusal to testify in its argument.[42] But here, the
State made two references to Nancy's refusal to testify dur-
ing its closing arguments, whereas Draper did not reference
Nancy's testimony at all for the duration of the trial.

Despite the prejudicial nature of the State's examination of
Nancy, the trial court failed to admonish the jury or provide
a curative instruction. The Court in *Namet* emphasized how a
curative instruction has the potential to remove any prejudice
from a witness who invokes a privilege in the presence of
the jury.

[17] Draper requested both an admonition and a jury instruc-
tion, and the trial court failed to give either. We cannot dis-
count the possibility that Nancy's assertion of privilege and
insistence in refusing to testify stuck in the minds of the jurors.
An admonishment immediately following Nancy's examina-
tion or the giving of Draper's requested jury instruction after
the close of evidence was critical to ensure a fair trial and to
eliminate the risk of prejudice. "An objection followed by an
admonition or instruction is typically presumed to be sufficient
to dispel prejudice."[43] Without an admonishment or curative
instruction, Nancy's refusal to testify cannot be considered
merely a "minor lapse" under the *Namet* framework. The trial

---

[39] *State v. Hartmann*, 239 Neb. 300, 313, 476 N.W.2d 209, 217 (1991).

[40] *State v. Johnson*, 255 Neb. 865, 873, 587 N.W.2d 546, 552 (1998).

[41] See *Namet, supra* note 5.

[42] *Id*.

[43] *State v. Gartner*, 263 Neb. 153, 162, 638 N.W.2d 849, 858 (2002).

court erred when it failed to either admonish after Nancy's testimony or instruct the jury at the close of evidence not to draw any inferences from Nancy's refusal to testify.

[18] Based on all the circumstances of the case, we conclude that the inferences derived from Nancy's refusal to testify and the statements read by the State added "critical weight" to the State's case in a form not subject to cross-examination. We are careful to point out that all of the errors, taken together, amount to reversible error. "[W]hile any one of several errors may not, in and of itself, warrant a reversal, if all of the errors in the aggregate establish that a defendant did not receive a fair trial, a new trial must be granted."[44] We cannot say that the sum of all the errors in this case is harmless beyond a reasonable doubt.

*Remaining Assignments
of Error.*

[19] Because we reverse Draper's convictions, we need not address his remaining assignments of error. "An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it."[45]

*Double Jeopardy.*

[20,21] Having found reversible error, we must determine whether the totality of the evidence admitted by the trial court was sufficient to sustain Draper's conviction. Upon finding reversible error in a criminal trial, an appellate court must determine whether the total evidence admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict.[46] If it was not, then double jeopardy forbids a remand for a new trial.[47] We find that the evidence was sufficient to sustain a guilty verdict, and thus, double jeopardy does not bar a new trial.

---

[44] *State v. Jacob*, 253 Neb. 950, 980, 574 N.W.2d 117, 141 (1998), *abrogated on other grounds, State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012).

[45] *State v. Rogers*, 277 Neb. 37, 72-73, 760 N.W.2d 35, 63 (2009).

[46] *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011).

[47] *Id.*

## CONCLUSION

We conclude that the cumulative errors of failing to comply with the provisions of § 27-513, the continued questioning of Nancy after she refused to testify, and the trial court's refusal to either admonish or instruct the jury not to draw an inference from the invocation of the privilege constitute reversible error. Because the evidence presented by the State was sufficient to sustain Draper's convictions, we reverse the convictions and remand the cause for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

---

RANDY THOMPSON ET AL., APPELLEES AND CROSS-APPELLANTS,
v. DAVE HEINEMAN, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF NEBRASKA, ET AL.,
APPELLANTS AND CROSS-APPELLEES.
___ N.W.2d ___

Filed January 9, 2015.    No. S-14-158.

1. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
2. **Judgments: Jurisdiction.** A jurisdictional question which does not involve a factual dispute presents a question of law.
3. **Constitutional Law: Statutes.** The constitutionality of a statute presents a question of law.
4. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case. Only a party that has standing—a legal or equitable right, title, or interest in the subject matter of the controversy—may invoke the jurisdiction of a court or tribunal.
5. **Standing: Proof.** Common-law standing usually requires a litigant to demonstrate an injury in fact that is actual or imminent.
6. **Taxation: Standing.** Taxpayer standing is an exception to the injury-in-fact requirement for standing.
7. **Actions: Taxation: Injunction.** A resident taxpayer, without showing any interest or injury peculiar to itself, may bring an action to enjoin the illegal expenditure of public funds raised for governmental purposes.
8. **Taxation: Standing: Public Purpose.** As a limited exception to the injury-in-fact requirement for standing, taxpayers may raise a matter of great public concern.
9. **Mandamus: Public Purpose.** The "great public concern" exception is another name for the "public interest" exception in early mandamus cases to enforce a public right.